674 P.2d 876

**STATE of Arizona, ex rel., ARIZONA DEPARTMENT OF REVENUE, Plaintiff-Appellee,**

*v.*

**MAGMA COPPER COMPANY, a corporation, Defendant-Appellant.**

**No. 1 CA–CIV 6082.**

Court of Appeals of Arizona, Division 1, Department B.

Sept. 27, 1983.

Review Denied Dec. 13, 1983.

Robert K. Corbin, Atty. Gen. by Frank L. Migray, Asst. Atty. Gen., Phoenix, for plaintiff-appellee.

Twitty, Sievwright & Mills by Howard A. Twitty, Phoenix, for defendant-appellant.

## OPINION

GREER, Judge.

In this appeal, we must determine whether certain Arizona privilege excise tax statutes [1] imposed an excise privilege tax on the income of appellant, Magma Copper Company (Magma), received from customers from January 1, 1975, through September 30, 1977, for converting copper Magma had produced in the cathode form into continuous cast rod and Magbar.[2] We hold that these statutes did not impose an excise privilege tax on this income and therefore reverse.[3] The facts necessary to a resolution of this matter are as follows.

In May, 1978, appellee, State of Arizona, ex rel. Arizona Department of Revenue (Department), notified Magma that for the audit period of January 1, 1975, through September 30, 1977, additional privilege taxes were due the state from Magma in the sum of $495,371.05. Magma timely protested said assessment and on September 14, 1978, a hearing was held before the Department. The Department denied Mag-

---

1. A.R.S. §§ 42–1309, 1310, 1361, and 1371. See also A.R.S. § 42–1311.

2. Magma produces continuous cast rod by melting electrolytic cathode copper, casting this copper into a continuous six square inch bar, and then drawing this bar through a series of rolling mills. "Magbar" (a trade name) is the cropped casting which is produced by shearing off a small quantity of the copper bar before the bar is drawn through the rolling mills.

3. The Arizona legislature, in enacting Laws 1982, Ch. 230, removed transaction privilege and affiliated excise taxes from the business of mining, smelting and producing certain minerals such as copper. This act became effective January 1, 1983, but such legislation did not affect Magma's tax liability for the period in question, January 1, 1975 through September 30, 1977.

ma's protest and Magma then appealed to the Arizona State Board of Tax Appeals, Division Two, pursuant to A.R.S. § 42–1338.01(A). The Board, after holding a hearing, found in favor of Magma and ordered the Department to abate its additional assessment.

On April 11, 1980, the Department filed suit in superior court pursuant to A.R.S. § 42–1338.01(B), and asked that judgment be rendered in its favor against Magma in the amount of $477,291.79, plus applicable interest from the time the tax was due and payable. Magma answered and counterclaimed for $654.75. The Department and Magma then agreed upon a stipulation of facts. The pertinent facts from this stipulation are as follows.

Magma operates two underground mines, one near Superior, Arizona and one near San Manuel, Arizona, both of which mine copper sulfide bearing ores from which copper and other metals are obtained. Copper bearing ores from these two mines are treated at mills at Superior and San Manuel to obtain concentrates containing 27% to 28% copper. These concentrates are then smelted at the Magma smelter at San Manuel producing anode copper containing 99% copper. The Magma refinery at San Manuel electrolytically refines these copper anodes to produce electrolytic cathode copper that uniformly analyzes 99.96% copper or better and meets the Standard Specification for Electrolytic Cathode Copper B–115 of the American Society for Testing and Materials. Unless electrolytic cathode copper meets or exceeds these specifications, it is not saleable as a refined copper recognized in domestic and international markets and has value only to the extent that it can be further refined at additional expense. Cathode copper which meets these specifications is marketable as a form of refined copper recognized in the domestic and international metal markets. The sales price for the electrolytic copper cathodes is based on the New York Commodity Exchange market prices which change daily and which are reported daily in the Wall Street Journal and the financial pages of other publications. These market prices are based on a large volume of sales of electrolytic cathode copper that are sold in the domestic metals market every business day. In 1975 and again in 1976, 32% of the production of copper of Magma was sold in the form of copper cathodes, and in 1977, this figure was 21%.

The balance of the production of electrolytic cathode copper produced by Magma during these years was fabricated into continuous cast rod and Magbar[4] at Magma's rod plant located in San Manuel in a building separate from the mill, smelter, refinery, and other operations at San Manuel. Magma sells continuous cast rod and Magbar to its customers for the electrolytic cathode copper price by weight for the contained refined copper plus a separate charge for fabricating the electrolytic cathode copper into continuous cast rod or Magbar.

After filing the stipulation of facts discussed above, the Department and Magma each moved for summary judgment. The trial court granted the Department's motion and denied Magma's motion. This appeal followed.

Magma argues that the privilege excise tax statutes[5] do not impose a tax on the income Magma received from customers from January 1, 1975, through September 30, 1977, for converting electrolytic cathode copper into continuous cast rod and Magbar. The Department asserts the contrary and contends that the amount due and owing for the period in question is $477,291.79,[6] plus applicable interest. This $477,-

---

4. The process of fabricating electrolytic cathode copper into continuous cast rod and Magbar is described in footnote 2, *supra*. The terms "convert" and "fabricate" are used interchangeably in this opinion.

5. See fn. 1, *supra*.

6. Magma apparently does not *dispute that* $477,291.79 is owed *if* A.R.S. §§ 42–1309, 1310, 1361, and 1371 are held to impose a tax on Magma's income derived from converting cathode copper into continuous cast rod and Magbar. Magma's dispute is with the applica-

291.79 figure is based on privilege excise taxes of 2½%. The relevant privilege excise tax statutes are as follows: A.R.S. §§ 42–1309(A), 42–1310(2)(a) (Excise Revenue Act 1%); A.R.S. § 42–1361(A)(3) (education excise tax ½%); and A.R.S. § 42–1371(B) (special excise tax for education 1%).

A.R.S. § 42–1310(2)(a), provided, for the time period in question:

The tax imposed by § 42–1309, subsection A shall be levied and collected at the following rates:

. . . .

2. At an amount equal to one per cent of the gross proceeds of sales or gross income from the business upon every person engaging or continuing within this state in the following businesses:

(a) Mining, quarrying, smelting, or producing for sale, profit or commercial use, any oil, natural gas, limestone, sand, gravel, copper, gold, silver or other mineral product, compound or combination of mineral products, or felling, producing or preparing timber or any other product of the forest for sale, profit or commercial use.

The education excise tax imposed by A.R.S. § 42–1361, for the period in question, provided, in pertinent part, that:

A. There is levied and shall be collected by the department of revenue a tax:

. . . .

3. On the privilege of doing business in this state, measured by the amount or volume of business transacted on account of their business activities, and in the amounts to be determined by the application, against values, gross proceeds of sales or gross income, as the case may be, at rates equal to fifty per cent of the rates imposed by:

. . . .

(c) Section 42–1310 on all businesses included in paragraph 2, subdivision (a) of such section.

bility of the tax statutes, not with the Department's calculations.

The special excise tax for education, A.R.S. § 42–1371, for the period in question, provided, in pertinent part, that:

B. There is levied and shall be collected by the department of revenue a tax on the privilege of doing business in this state at a rate of one per cent of the gross proceeds of sales or gross income from the business upon every person engaging or continuing within this state in the business of mining, quarrying, smelting, or producing for sale, profit or commercial use, any oil, natural gas, limestone, sand, gravel, copper, gold, silver or other mineral product, compound or combination of mineral products.

Magma raises three arguments to support its contention that the above tax statutes are not applicable to Magma's income derived from fabrication of electrolytic cathode copper into continuous cast rod and Magbar. First, fabricating electrolytic cathode copper into continuous cast rod and Magbar is "manufacturing" and hence, exempt from privilege excise taxing statutes. Second, the privilege excise tax statutes should not be construed to tax the fabrication of electrolytic cathode copper into continuous cast rod and Magbar. Third, taxation of Magma's income derived from fabrication of electrolytic cathode copper into continuous cast rod and Magbar is a denial of equal protection.

■ Magma's first argument is that the process of fabricating electrolytic cathode copper into continuous cast rod and Magbar constitutes "manufacturing." This appears to be an accurate description. *See State Tax Commission v. Wallapai Brick and Clay Products,* 85 Ariz. 23, 330 P.2d 988 (1958) (making of brick is manufacturing). Magma maintains that the label of "manufacturing" is significant for three reasons. First, in 1950 the legislature repealed a section of the Excise Revenue Act[7] which had previously imposed a tax upon the business of manufacturing (Laws 1950, Ch. 57,

7. The section repealed by Laws 1950, Ch. 57, 1st Special Session, was contained in A.R.S. § 42–1310(2).

1st Special Session). Second, the rule of *ejusdem generis*,[8] as applied to the phrase "copper, gold, silver or other mineral product, compound or combination of mineral products," (*see* A.R.S. § 42–1310(2)(a)) would exclude *manufactured* copper products from taxation. And, third, the state tax commission has defined for well over twenty years, the phrase "mineral product" used in A.R.S. § 42–1310(2)(a) to include "all substances which can be mined from the earth."[9] *See Industrial Commission v. Harbor Insurance Co.,* 104 Ariz. 73, 449 P.2d 1 (1968) (the construction placed on a statute by the executive body which administers it, if acquiesced in for a long period of time, will not be disturbed unless said construction is manifestly erroneous).

However, while these arguments indicate resourcefulness on Magma's part, certain manufacturing is indeed taxed under Arizona's privilege excise tax statutes. For example, in *Wallapai,* the court agreed that the making of brick is "manufacturing", but held that the making of brick was, nonetheless, subject to tax under the Excise Revenue Act. The court in *Wallapai* stated:

> While the court agrees that the making of brick is 'manufacturing' (citation omitted), the court does not agree that the legislature has exempted all forms of manufacturing from the application of the Excise Revenue Act.

85 Ariz. at 30, 330 P.2d at 993. In addition, in *State Tax Commission v. Ranchers Exploration and Development Corp.,* 22 Ariz. App. 480, 528 P.2d 866 (1974), the court taxed not only the copper in the copper cathodes, but also the starter sheets which become a physical and inseparable part of the copper cathodes. Hence, Arizona courts have taxed the value of manufactured mineral products, and not just the value of the minerals mined from the earth.

Magma next maintains that the privilege excise tax statutes should not be construed to tax income derived from the fabrication of electrolytic cathode copper into continuous cast rod and Magbar. While there are several tax statutes involved here, the statutes are similar. The statutes impose a privilege excise tax on the "gross proceeds of sale or gross income from the business" upon those engaging in "mining, quarrying, smelting, or producing for sale, profit or commercial use, any . . . copper, . . . or other mineral product, compound or combination of mineral products. . . ." *See* A.R.S. §§ 42–1309, 1310, 1361, and 1371.

■ In interpreting a statute, the court must ascertain and give effect to the intent of the legislature. *Mardian Construction Co. v. Superior Court,* 113 Ariz. 489, 492, 557 P.2d 526, 529 (1976). Doubtful tax statutes should be given a strict construction against the taxing power, giving due regard to the expression of the legislative intent. *State Tax Commission v. Miami Copper Co.,* 74 Ariz. 234, 243, 246 P.2d 871, 877 (1952); *Alvord v. State Tax Commission,* 69 Ariz. 287, 291, 213 P.2d 363, 366 (1950).

Here, the state emphasizes that the relevant tax statutes apply not only to mining, quarrying, and smelting, but also to "producing for sale, profit or commercial use," any mineral product. The state argues that the plain language of these statutes includes income derived from the conversion of refined copper (electrolytic cathode copper) into more refined copper (continuous cast rod or Magbar). We would agree with this interpretation if the language in these privilege excise tax statutes was given its literal meaning. However, in 1958, the supreme court in *Wallapai* limited the precise language in issue. The court stated:

> In its brief the plaintiffs sought to label this subsection [A.R.S. § 42–1310(2)(a)]

---

8. *Ejusdem generis* is a rule of statutory construction that provides "where general words follow the enumeration of particular classes of persons or things, the general words should be construed as applicable only to persons or things of the same general nature or class of

those enumerated". *White v. Moore,* 46 Ariz. 48, 53–54, 46 P.2d 1077, 1079 (1935).

9. Magma implies that this definition excludes manufactured products, such as continuous cast rod.

as being a 'mining' tax. The defendants have taken the position, and the court believes rightfully, that such a label would be a misnomer inasmuch as this subsection applies not only to mining, quarrying and smelting, but also to '*producing for sale, profit or commercial use, any ... other mineral products, compound or combination of mineral products, ....*' (Emphasis supplied.) The plaintiffs have argued somewhat persuasively that if this language is given its literal meaning, a tax would result upon many kinds of manufacturing which the legislature clearly did not intend to tax, such as manufacturing of a gold watch or a silver spoon. The court agrees that the legislature never intended to tax activities which fall within the categories suggested by the plaintiffs, but, nevertheless, is of the opinion that finished clay brick is a mineral product which 'has been produced' by the plaintiff brickmakers, and is within the purview of this taxing statute.

85 Ariz. at 30–31, 330 P.2d at 993.

Magma has emphasized this limiting language and has also focused on language later in the *Wallapai* decision, wherein the court stated:

> Without intending to delimit exactly the application of this particular tax [the privilege excise tax specified in A.R.S. § 42–1310(2)(a)] upon various forms of manufacturing of mineral products, the court certainly does not believe that it was intended that the tax be imposed upon the manufacturing of articles entirely disassociated with mining operation merely because such articles are manufactured from mineral products.

85 Ariz. at 31, 330 P.2d at 993.

Thus, the question in this case becomes whether the fabrication of electrolytic cathode copper into continuous cast rod or Magbar is sufficiently disassociated from the mining operations to be considered nontaxable. The state argues that this question should be answered in the negative and raises, in effect, two arguments to support its contention: first, the fabrication of electrolytic cathode copper into continuous cast rod or Magbar is an integral part of Magma's mining operation; and second, the electrolytic cathode copper which is converted into continuous cast rod or Magbar is not sold until after its conversion.

Magma counters by contending that nontaxable activity may be separated from taxable activity, that electrolytic cathode copper is the first marketable product, and that a sale is not needed in order to disassociate a manufacturing process from the mining operation.

(1) *Separation:* Magma maintains that its fabrication of electrolytic cathode into continuous cast rod and Magbar is separate from its milling, mining, and smelting operations. The fabrication process takes place in a building apart from other operations and indeed, the rod plant at San Manuel, wherein the fabrication takes place, is assessed differently for purposes of property taxes.[10]

Magma insists that the fabrication process is sufficiently distinct from its mining operations so that one can be taxed but not the other. This separation can be achieved here because a value can easily be assigned to the electrolytic cathode copper prior to its conversion into continuous cast rod or Magbar.

Magma cites two cases for the proposition that activities may be separated for tax purposes. In *Ebasco Services Inc. v. Arizona State Tax Commission,* 105 Ariz. 94, 459 P.2d 719 (1969), Ebasco, an engineering and

---

**10.** The Department and Magma, in their stipulation of facts, provided the following with respect to property tax assessment:

> The Arizona Department of Revenue has always assessed the mine, mill, smelter and refinery of Magma Copper at San Manuel as Class One property, as that term is defined in Arizona Revised Statutes A.R.S. § 42–136.

The Department of Revenue has never assessed the rod plant at San Manuel as Class One property. The rod plant at San Manuel has, with the approval of the Department of Revenue, always been assessed by the County Assessor as property devoted to commercial or industrial use and classified as Class Three property pursuant to A.R.S. § 42–136.

construction firm, successfully argued that its contracting business was the only taxable activity and that there was no privilege excise tax liability with respect to its engineering services. In *Dennis Development Co. v. Department of Revenue,* 122 Ariz. 465, 595 P.2d 1010 (App.1979), the court held that the receipts from contracting, not the receipts from the sale of real property, were taxable under the transaction privilege tax statutes. In both of these cases, the nontaxable activity was an "integral" part of the business, but was, nonetheless, distinct enough to be separated out for purposes of tax liability.

(2) *First Marketable Product:* Electrolytic copper cathode is marketable as a form of refined copper recognized in the domestic and international markets. The sales price for the electrolytic copper cathode is based on the New York Commodity Exchange market prices which change daily and which are reported daily in the Wall Street Journal and the financial pages of other publications. Indeed, Magma sells a considerable portion of its copper in the form of cathodes. Based on these facts, Magma contends that the electrolytic copper cathode is the "first marketable product" produced as that phrase is used in *Wallapai.* There, the court noted that raw clay has no "commercial use" until it is made into brick. Therefore, the court in *Wallapai* held that a finished brick was the first marketable product and income derived from the sale of those bricks was taxable.

(3) *Sales:* Magma contends that privilege excise tax liability may end prior to a sale. Magma argues that the production of electrolytic cathode copper is a mineral product which has been produced "for sale, profit or commercial use" and that excise tax liability ends when that point is reached. Magma

cites to *Industrial Uranium Co. v. State Tax Commission,* 95 Ariz. 130, 132, 387 P.2d 1013, 1014 (1963), wherein the Arizona Supreme Court stated:

> We have stated the nature of this tax repeatedly. It is not a tax upon sales. It is purely an excise tax upon the privilege or right to engage in business in Arizona measured by the gross volume of business conducted within the state. *Arizona State Tax Commission v. Garrett Corp.,* 79 Ariz. 389, 291 P.2d 208.

## CONCLUSION

The court holds that the fabrication of electrolytic cathode copper into continuous cast rod and Magbar is sufficiently disassociated from Magma's mining operations so that the income derived from the fabrication is not taxable under Arizona's excise tax statutes. The court, in reaching this conclusion, is reluctant to embrace a generalized first marketable product theory. Rather, upon the facts of this particular case, the activity of fabricating electrolytic cathode copper into continuous cast rod and Magbar is an activity which goes beyond producing for sale, profit or commercial use, the mineral resources of this state. *See Wallapai.* The separateness of the fabrication process is underscored by the Department's unwillingness to tax a company which merely operates a rod plant.[11]

Although there is no explanation in the record for the Department's policy in this regard, the policy would appear to be based upon the Department's belief that the fabrication of electrolytic cathode copper into continuous cast rod or Magbar is an activity sufficiently disassociated from mining operations so as to be nontaxable. *See Wallapai.*[12]

---

**11.** In the stipulation of facts, the Department and Magma stipulated as follows:

> It is the position of the Plaintiff [Department] that a party who is not otherwise subject to the transaction tax under the provisions of ARS § 42–1310(2)(a), would not become subject to the tax under § 42–1310(2)(a) solely by operating a rod plant wherein such party purchases electrolytic cathode copper which

it fabricates into continuous cast rod and sells to its customers.

**12.** The court does not address the equal protection issue in this case as the taxing statutes have been construed in a manner favorable to Magma. The court would also add that A.R.S. § 42–1311(B) is not applicable to the instant case, because Magma *sells* the continuous cast rod and Magbar it processes to the customer.

For the foregoing reasons, the judgment is reversed. Judgment is entered against the Department on its complaint and in favor of Magma on its counterclaim in the amount of $654.25.[13]

FROEB, P.J., and GRANT, J., concur.

While Magma chooses to explain the differential in price between continuous cast rod and cathode copper as a manufacturing charge, A.R.S. § 42–1311 is directed at an entity which charges for service, but does not actually sell the product serviced. A.R.S. § 42–1311(B), provided, during the period in question, that: "In the case of persons engaged in the businesses classified in subdivision (a) of paragraph 2 of § 42–1310, whose incomes, wholly or in part, are derived from service or manufacturing charges instead of from sales of the product manufactured or handled, the rate shall be applied to the gross income of such persons derived from such service or manufacturing charge."

13. The Department admitted in its Reply to Counterclaim, that if the assessment attributable to the income from converting refined cathode copper into rod and bars was held to be void, that Magma would be entitled to a refund in the amount of $654.25.