937 P.2d 654

**CENTRIC–JONES COMPANY,
Plaintiff–Appellant,**

v.

**TOWN OF MARANA, Defendant–
Appellee.**

No. 1 CA–TX 94–0025.

Court of Appeals of Arizona,
Division 1, Department T.

Sept. 26, 1996.

Review Denied June 5, 1997.*

---

* Moeller, J., did not participate in the determination of this matter.

Kimerer & LaVelle, P.L.C. by Michael J. LaVelle, Phoenix and John M. Cogswell, Denver, for Plaintiff–Appellant.

Gabroy, Rollman & Bosse, P.C. by Steven L. Bosse, Richard A. Brown, Tucson, for Defendant–Appellee.

## OPINION

SULT, Judge.

The Board of Tax Appeals sustained a final assessment of Town of Marana ("Marana")

transaction privilege taxes on Centric–Jones Company's ("Centric") contracting income for the period October 1, 1986, through September 30, 1990. Centric brought this action in the Arizona Tax Court for *de novo* review of the Board's decision. The tax court granted summary judgment for Marana. Centric now appeals, raising these issues:

1. Whether Arizona Revised Statutes Annotated ("A.R.S.") section 9–240(B)(18) authorizes an Arizona town government to impose a transaction privilege tax;

2. Whether the Due Process Clause of the United States Constitution invalidates the Marana tax;

3. Whether the Commerce Clause of the United States Constitution invalidates the Marana tax;

4. Assuming the validity of the tax, whether Centric's business activities in Marana constituted exempt "casual activity" within Marana's taxing ordinance; and

5. Assuming the validity of the tax, whether Centric was entitled to a substantially reduced assessment pursuant to exemptions provided by Marana's former taxing ordinance.

We have jurisdiction pursuant to A.R.S. section 12–2101(B) (1994).

## FACTS

Marana is an Arizona town incorporated pursuant to A.R.S. section 9–101, *et seq.* Before August 31, 1987, a transaction privilege tax pursuant to Marana Ordinance No. 79.03 was in effect. Effective August 31, 1987, Marana adopted new transaction privilege tax provisions in Marana Ordinance No. 87–10. Both ordinances required transaction privilege permits or licenses as a condition of engaging within the town in any business subject to the transaction privilege tax. Both imposed a 2% transaction privilege tax on a tax base of 65% of the gross income from the business of acting as a prime contractor within the town limits. Both taxes were the usual type of transaction privilege tax, namely one which is measured and paid at defined intervals on the volume of business already completed by the taxpayer.

Centric is a Colorado partnership that was formed to engage in the construction business throughout the Rocky Mountain region. In December 1986, it entered into a contract with the United States Bureau of Reclamation to build the Twin Peaks and Sandario Pumping Plants and Switch Yards for the Central Arizona Project ("CAP"). The site for the Twin Peaks Pumping Station was within the town limits of Marana, ten to eleven miles from the town center. While Centric was constructing the Twin Peaks Pumping Station, neither it nor its representatives were aware that the site was inside the town limits.

Centric's principal place of business is in Denver, Colorado. All acquisition, requisition and accounting tasks in connection with the Twin Peaks project were accomplished in Colorado. Centric had a trailer on the project site for supervision and management and received its project mail in the Town of Rillito. Other than the Twin Peaks project, it did no business in Marana, had no office in the town, and did not hold itself out as being engaged in the construction business in Marana.

Centric employed about sixty-five people on the CAP contract. Ten to twelve of them came from Colorado and the remainder were hired locally. In addition, Centric's subcontractors hired about fifty employees to work on the project.

In the tax court, Marana filed an affidavit from its town manager, Hurvie E. Davis. Davis averred that Marana had performed numerous municipal services for Centric's benefit, including traffic control, road maintenance, police surveillance and investigation, and police emergency responses. Attached to Davis's affidavit were two letters from Centric to the town, thanking the town for its cooperation in Centric's closing of Twin Peaks Road for excavation in mid–1988.

Centric countered with an affidavit from its project supervisor, Wilburt Hinton. Hinton confirmed Centric's lack of knowledge of the location of the project within town limits and averred that Centric representatives had not seen town personnel perform daily traffic control or frequent, routine road maintenance. Hinton denied that Centric had ever

called the Marana Police Department and stated that the only call Centric made for law enforcement assistance during the project was to the Pima County Sheriff's Department. He also stated that Centric's emergency procedures had called for it to seek emergency fire or medical services from the Picture Rocks Fire Department. Hinton lastly stated that Centric's 1988 correspondence with Marana, to which town manager Hurvie Davis referred, arose out of a cooperative effort to reroute Marana school buses during the closure of Twin Peaks Road.

During the project, Centric purchased tangible personal property at a total cost of $5.437 million and used it in performing the CAP contract. This property included pipes and valves of four inches in diameter or larger valued at $1.787 million. Centric's total compensation under the CAP contract was $13.161 million. Although Centric purchased and used tangible personal property in performing the CAP contract, it does not engage in any retail business.

The 1986 CAP contract was Centric's first construction project in Arizona. In late 1988 or early 1989, Centric began to enter into contracts for other construction work in Mesa, Tucson, Phoenix, and Scottsdale. In March 1987, Centric obtained an Arizona transaction privilege tax license in the prime contracting classification. It filed Arizona sales, use, and severance tax returns, and paid prime contracting taxes to the state from March 1987 through September 1990.

Marana audited Centric for the period October 1, 1986, through September 30, 1990. The town assessed unpaid transaction privilege taxes against Centric totalling $190,769.67, including interest through November 30, 1990. By agreement between Centric and Marana, Centric paid $100,000 of this total in return for Marana's waiver of penalties and a stipulation that no additional tax need be paid until the dispute was litigated to conclusion.

## ANALYSIS

### Arizona Towns' Authority to Impose Transaction Privilege Tax

■ An Arizona town has only those powers that the Arizona Constitution and statutes confer on it expressly or by necessary implication. *City of Scottsdale v. Superior Court,* 103 Ariz. 204, 439 P.2d 290 (1968); *Maricopa County v. Maricopa County Mun. Water Conservation Dist. No. 1,* 171 Ariz. 325, 830 P.2d 846 (App.1991). Both Centric and Marana identify A.R.S. section 9–240(B)(18) as the only statute that expressly authorizes Arizona towns to impose a tax relating to the privilege of engaging in business within their boundaries. This statute provides in pertinent part:

> The common council shall ... have power within the limits of the town:
>
> . . . .
>
> (18) To fix the amount of license taxes to be paid by any person, firm, corporation or association for carrying on any business, game or amusement, calling, profession or occupation, and prescribe the method of collection or payment of the same, for a stated period in advance, and fix penalties for failure to comply by fine or imprisonment, or both.

Centric contends that if section 9–240(B)(18) is properly construed in favor of town taxpayers, it does not confer on an Arizona town the power to enact a transaction privilege tax of the type imposed by Marana. Centric concedes, citing *McCarthy v. City of Tucson,* 26 Ariz. 311, 225 P. 329 (1924), that a "license tax" as used in this statute is not a regulatory tax under the police power but an excise tax for revenue purposes. Centric further concedes that a transaction privilege tax is also an excise tax for revenue purposes. Centric argues, however, that while "license tax" as used in the statute should be construed as a revenue tax, the balance of the statutory language shows that the term does not contemplate a "transaction privilege" type of revenue tax. Specifically, Centric asserts that a transaction privilege tax generally is a "backward looking" tax; that is, one which, at defined intervals, is measured and paid after the volume of business done in the immediate past is ascertained. According to Centric, section 9–240(B)(18) clearly precludes such a tax since the statutory language permits only a "forward looking" tax; that is, one which is both

ascertained and paid "in advance" of any business being conducted. Therefore, Centric concludes, Marana's transaction privilege tax exceeds its statutory power.

We undertake our analysis guided, as always, by the principle that the goal of statutory interpretation is to determine and give effect to the legislative intent behind the statute. *Calvert v. Farmers Ins. Co. of Arizona,* 144 Ariz. 291, 294, 697 P.2d 684, 687 (1985). We look first at the words of the statute itself, and if their meaning is clear, we accord the statute that plain meaning. *Mail Boxes v. Industrial Comm'n of Arizona,* 181 Ariz. 119, 121, 888 P.2d 777, 779 (1995). If, however, an ambiguity exists such that the legislative intent cannot be ascertained from the statute, we resort to the rules of statutory construction. *Id.*

For ease of reference, we will restate the text of section 9–240(B)(18), broken into its logical grammatical units:

The common council shall ... have power within the limits of the town:

(18) To fix the amount of license taxes to be paid by any person, firm, corporation or association for carrying on any business, game or amusement, calling, profession or occupation,

and prescribe the method of collection or payment of the same,

for a stated period in advance,

and fix penalties for failure to comply by fine or imprisonment, or both.

One could read this statute to support Centric's position. If we assume that the drafters intended the appositive prepositional phrase "for a stated period in advance" to modify both the initial clause "To fix the amount of license taxes to be paid by any person ... for carrying on any business" as well as the second clause "[to] prescribe the method of collection or payment of the same," then the initial clause would be equivalent to: "To fix for a stated period in advance the amount of license taxes to be paid by any person ... for carrying on any business" Under this construction, the statute would authorize the imposition of a license tax only of the type which must be ascertained and paid in advance.

This reading, however, is not the only one that may logically be derived from the statute. The drafters' liberal use of commas in the statute suggests that they intended to follow the presumptive rule that an adjectival or adverbial phrase modifies only the clause that immediately precedes it. *See Allstate Ins. Co. v. O'Toole,* 182 Ariz. 284, 288 n. 6, 896 P.2d 254, 258 n. 6 (1995). As thus interpreted, the prepositional phrase, "for a stated period in advance," would apply only to the second clause of the statute, rendering the clause equivalent to: "[to] prescribe the method of collection or payment of the same for a stated period in advance." Under this reading, a town would have the authority to fix the amount of taxes to be paid by setting forth in advance the method to be used to collect or pay taxes and stating in advance the period to which the tax will apply, with no limitation on what that period can be. With this interpretation, the statute would authorize imposition of a transaction privilege tax of the usual type, *i.e.,* one measured by applying, at the conclusion of a stated period, the previously established tax rate to the volume of business conducted within the town during the concluded period.

Neither reading, however, stands out as the plain meaning of this rather poorly drafted statute. We therefore conclude that the statute is ambiguous. Consequently, we must now resort to the rules of construction to determine just what the legislature intended to authorize.

Centric's first argument is straightforward. It asserts that if we find an ambiguity in the statute, we are required as a matter of law to find that the statute does not grant the taxing power at issue. This argument is based on language from the supreme court case of *City of Phoenix v. Arizona Sash, Door & Glass Co.,* 80 Ariz. 100, 293 P.2d 438, *modified on other grounds,* 80 Ariz. 239, 295 P.2d 854 (1956). In commenting on municipal taxation, the *Arizona Sash* court stated:

[T]he power of taxation under the constitution inheres in the sovereignty of the state and may be exercised only by the legislature except where expressly delegated to political subdivisions of the state or to municipal corporations. The authority of

municipalities to levy a tax must be made clearly to appear and doubts, if any, as to the power sought to be exercised must be resolved against the municipality; the power to tax is a separate, independent power and exists in municipal corporations only to the extent to which it is clearly conferred by the charter or state statutes and its existence cannot be inferred or deduced from other powers conferred.

*Id.* at 102–03, 293 P.2d at 440–41.

From this language, Centric posits that, in the case of a statutory grant of taxing authority, the power to tax in the particular area in question must be crystal clear from the statutory language itself. If the statute is ambiguous on this point, no recourse to principles of statutory construction is permitted in order to resolve the ambiguity. Rather, the maxim that all ambiguities must be resolved in favor of the taxpayer must be applied, with the result that no power to tax may be found.

Centric cites no direct authority for this unusual proposition. *Arizona Sash* itself does not so hold, as it was not a case which resorted to tools of construction to resolve an ambiguity. Rather, in inquiring whether a City of Phoenix taxing ordinance was authorized by the city charter and, in turn, whether the city charter conflicted with the state constitution, the *Arizona Sash* court found that under the clear language of both the constitution and the charter, the taxing ordinance was authorized. 80 Ariz. at 102–05, 293 P.2d at 439–42.

Centric also does not explain why, after *Arizona Sash*, both this court and our supreme court have routinely continued to apply various principles of statutory construction when considering issues of taxing power. *See, e.g., State Tax Comm'n v. Wallapai Brick and Clay,* 85 Ariz. 23, 30, 330 P.2d 988, 995 (1958) (acknowledging maxim but employing construction tool of reading entire system of statutes to find disputed tax applied to taxpayer activity); *Bassett v. City of Tucson,* 137 Ariz. 199, 201–02, 669 P.2d 976, 978–79 (App.1983) (applying principles of statutory construction to find taxpayer subject to municipal taxing ordinance).

We also note the full statement of the maxim: "[D]oubtful tax statutes should be given a strict construction against the taxing power, *giving due regard to the expression of the legislative intent."* *State Tax Comm'n v. Miami Copper Co.,* 74 Ariz. 234, 243, 246 P.2d 871, 877 (1952) (emphasis added); *accord State ex rel. Dep't of Revenue v. Magma Copper,* 138 Ariz. 322, 326, 674 P.2d 876, 880 (App.1983). We do not read this as absolving us of our duty to find legislative intent through statutory construction whenever, on an initial reading, the subject statute yields an ambiguity. Yet that is what Centric's interpretation of *Arizona Sash* would require.

■ We see the function of the maxim as follows. If, when the court concludes its process of construction, an ambiguity nevertheless remains, the maxim does generally dictate a result in favor of the taxpayer. *See Ebasco Services, Inc. v. Arizona State Tax Comm'n,* 105 Ariz. 94, 459 P.2d 719 (1969). *But see Department of Revenue v. Southern Union Gas Co.,* 119 Ariz. 512, 514, 582 P.2d 158, 160 (1978) (acknowledging but refusing to apply maxim by finding that the undesirable consequence of applying it was the controlling factor in determining legislative intent). Centric's approach, however, would sidestep the process of construction entirely and apply the maxim prematurely. We do not read *Arizona Sash* as countenancing such a process and we therefore reject Centric's approach.

■ We turn, then, to the task of determining what type of taxing power the legislature intended Arizona towns to have. In this process, we may consider the statute's historical background, its effects and consequences, and its spirit and purpose. *Hayes v. Continental Ins. Co.,* 178 Ariz. 264, 268, 872 P.2d 668, 672 (1994). We begin with the history of the predecessors to section 9–240(B)(18). Arizona Code Annotated section 16–207(18) (1949), in which the language of current section 9–240(B)(18) first appeared, was enacted in 1949. This 1949 statute supplanted sections 16–207(18) through (22) of the 1939 Arizona Code which, in their time, had supplanted sections 373(18) through (22) of the Arizona Revised Code of 1928.

The 1928 and 1939 versions had authorized Arizona towns to "license, tax and regulate" in excess of sixty enumerated business activities.[1] Under these pre–1949 statutes, the authority of towns to "license, tax and regulate" included the authority to impose transaction privilege taxes calculated on past business volume. *See City of Glendale v. Betty,* 45 Ariz. 327, 43 P.2d 206 (1935) (sustaining quarterly license tax on enumerated businesses in increasing amounts according to specified ranges of quarterly sales volume). Significantly, despite the replacement of the former language by the current language in 1949, no question has ever been raised about the continuation of Arizona towns' pre–1949 authority to levy transaction privilege taxes of the type under consideration here. Moreover, as far as the reported cases and later enactments reveal, neither the legislative, executive nor judicial branch of state government has ever taken the position that the 1949 enactment invalidated any city or town's pre–1949 transaction privilege taxing ordinance, or that the continuation of any such taxing ordinance beyond the effective date of the 1949 enactment exceeded Arizona towns' legislative authority under that enactment or its successor, section 9–240(B)(18). *See e.g., City of Prescott v. Town of Chino Valley,* 163 Ariz. 608, 790 P.2d 263 (App.1989), *vacated in part on other grounds,* 166 Ariz. 480, 803 P.2d 891 (1990) (where Town of Chino Valley's authority to impose transaction privilege tax on Prescott's gross income from groundwater pumping activities within town limits was under attack, no question was raised concerning Town's legal power to impose transaction privilege tax measured by volume of business).

This historical backdrop illustrates that towns in Arizona have exercised the power to impose a transaction privilege tax since before statehood to the present time. In *Bohannan v. Corporation Comm'n,* 82 Ariz. 299, 313 P.2d 379 (1957), our supreme court, in construing a constitutional provision and its companion statute being challenged for the first time in forty-five years, stated:

Uniform acquiescence of meaning, if it is not manifestly erroneous, will not be disturbed, at least in cases of doubt, for injustices are likely to result after a long period of time during which many rights will necessarily have been acquired.

*Id.* at 303, 313 P.2d at 382. *Accord In re Pima County Juvenile Action No. J–78632,* 147 Ariz. 584, 587, 712 P.2d 431, 434 (1986).

The *Bohannan* principle is particularly applicable in this case. We have no doubt that many towns other than Marana impose and collect a transaction privilege tax, have done so for many years, and that the revenues therefrom constitute an important aspect of each town's operation. Until now, this power has not been questioned but has been acquiesced in. We cannot say that reading section 9–240(B)(18) to authorize this power is manifestly erroneous. *Bohannan,* 82 Ariz. at 303, 313 P.2d at 381–82 We therefore conclude that this history of acquiescence since 1949 supports the finding that the legislature did not intend by the 1949 enactment to eliminate the power of towns to impose a transaction privilege tax.

■ Another principle of construction relevant here is the requirement that we look to other statutes that relate to the same subject matter. As our supreme court has instructed:

If reasonably practical, a statute should be explained in conjunction with other statutes to the end that they may be harmonious and consistent. If the statutes relate to the same subject or have the same general purpose—that is, statutes which are in pari materia—they should be read in connection with, or should be construed together with other related statutes, as though they constituted one law. As they must be construed as one system governed by one spirit and policy, the legislative intent therefor must be ascertained not alone from the literal meaning of the wording of the statutes but also from the view of the whole system of related statutes. This rule of construction applies even where the statutes were enacted at differ-

---

1. Substantially these same provisions had been in effect in Arizona since 1901. *See* Civil Code of 1901, Title 11, Ch. 9, § 545(1), paras. 17–22; Civil Code of 1913, Title 7, § 1831, paras. 17–22.

ent times, and contain no reference one to the other. . . .

*State v. Sweet,* 143 Ariz. 266, 270–71, 693 P.2d 921, 925–26 (1985) (quoting *State ex rel. Larson v. Farley,* 106 Ariz. 119, 122, 471 P.2d 731, 734 (1970)).

Other enactments do reflect the legislature's clear understanding that, since 1949, towns have had and continue to have full authority to impose transaction privilege taxes. For example, in 1980, the legislature added A.R.S. section 42–1382 (1980), subsection C of which provided:

> An incorporated city or town may impose a transaction privilege, sales or other similar tax on sales of food. *If a city or town exempts sales of food from its tax or imposes a different transaction privilege rate on the gross proceeds of sales or gross income from sales of food and non-food items, it shall* . . . .

(Emphasis added). This statute obviously assumes a pre-existing town transaction privilege tax, and grants permission to a town to either tax food or to exempt it. The assumption in this statute certainly illustrates that the legislature understood when it adopted section 42–1382 that Arizona towns already had the general authority to impose a transaction privilege tax.[2]

Probably most indicative of a consistent legislative understanding are A.R.S. sections 42–1451 *et seq.* These sections generally authorize the Arizona Department of Revenue to contract with "cities, towns and recreation districts of this state which levy transaction privilege taxes" to collect such local taxes at the same time and in the same manner as it collects state transaction privilege taxes, and to remit those local taxes to the local entities. A.R.S. § 42–1451(B). This statutory collection structure obviously envisions that the local "transaction privilege tax" that the Department will be collecting, like the state transaction privilege tax, will be of the "backward" kind; that is, the kind that is imposed

in arrears based on business volume. *See* A.R.S. §§ 42–1301 *et seq.*

To find, as Centric would have us do, that Arizona towns have no authority to impose a transaction privilege tax, would vitiate significant elements of the statutes discussed above. But we construe related statutes in order to harmonize them and give them full effect, not to render them meaningless. *See U.S. Xpress, Inc. v. Arizona Tax Court,* 179 Ariz. 363, 366, 879 P.2d 371, 374 (App.1994). Only by concluding that the legislature intended, in section 9–240(B)(18), to authorize towns to impose a transaction privilege tax, can we give full effect to the provisions of section 42–1382 and sections 42–1451 *et seq.* Moreover, this is the only conclusion that comports with the background of section 9–240(B)(18) and the historical acquiescence in the power of towns to so tax.

Centric offers no significant countervailing considerations regarding the legislature's intent. Our construction of the statute leaves no ambiguity about the legislative intent; namely, that the legislature fully intended that, subsequent to 1949, Arizona towns would continue to have the power to impose a transaction privilege tax of the type that is measured and paid on the volume of business conducted over a defined interval in the immediate past. The tax court did not err in so finding.

## Validity of Assessment Under Due Process Clause

Centric contends that the Marana tax violated the Due Process Clause of the United States Constitution. Centric first argues that there did not exist a "minimum connection" between Marana and the transaction it sought to tax. Centric secondly argues that Marana's imposition of the tax on 100% of Centric's contract receipts resulted in a tax out of all appropriate proportion to the

---

2. This understanding has been carried forward in the current version of A.R.S. section 42–1382 (Supp.1995). Subsection D provides:

> An incorporated city or town shall not impose a transaction privilege, sales or other similar tax on sales of food or other items purchased with United States department of

agriculture food coupons issued under the food stamp act of 1977 (P.L. 95–113; 91 Stat. 958) or food instruments issued under § 17 of the child nutrition act (P.L. 95–627; 92 Stat. 3603; and P.L. 99–661, § 4302) but may impose such a tax on other sales of food.

amount of receipts generated in Marana versus the receipts generated in its home state of Colorado.

Both of Centric's arguments derive from *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), where the U.S. Supreme Court summarized due process limits on state taxation of interstate businesses:

> The Due Process Clause "requires some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax," *Miller Brothers Co. v. Maryland*, 347 U.S. 340, 344–345 [74 S.Ct. 535, 539, 98 L.Ed. 744] (1954), and that the "income attributed to the State for tax purposes must be rationally related to 'values connected with the taxing State.'" *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 273 [98 S.Ct. 2340, 2344, 57 L.Ed.2d 197] (1978).

504 U.S. at 306, 112 S.Ct. at 1909–10. *Accord Trinova Corp. v. Michigan Dep't of Treasury*, 498 U.S. 358, 111 S.Ct. 818, 112 L.Ed.2d 884 (1991). With respect to the "connection" prong of this test, *Quill* makes it clear that a minimum connection between the taxing authority and the putative taxpayer exists whenever the taxpayer purposefully directs its activities toward the taxing jurisdiction, whether by establishing a physical presence there or otherwise, such that the taxpayer has fair warning that its activities may subject it to the taxing jurisdiction's authority. 504 U.S. at 306–08, 112 S.Ct. at 1909–11. Here Centric purposefully bid on, obtained, and performed a substantial contract over a period of more than three years within the town limits of Marana. Under these circumstances Centric surely had fair warning that it would be subject to the taxing authority of the local governmental unit in which the project was located.

■ Centric nevertheless argues that it had to be aware in advance that its construction project was within the town limits before Marana could tax it. Centric cites no authority for this proposition and we do not find the argument persuasive. It seems little to ask of a taxpayer that it inquire into readily available sources of information at town, county or state offices in order to determine in what taxing jurisdiction it is proposing to do business. There is no allegation by Centric, nor any evidence, that Marana officials did or said anything that could remotely be construed as concealing from Centric that the Twin Peaks project was within town limits. We therefore conclude that imposition of a requirement that a putative taxpayer know in advance that it is within a particular taxing jurisdiction is not necessary to satisfy the "fair warning" concept that underlies the due process clause.

■ In arguing the second prong of the *Quill* test, Centric cites *Hans Rees' Sons v. North Carolina*, 283 U.S. 123, 51 S.Ct. 385, 75 L.Ed. 879 (1931), for the proposition that a state taxing scheme runs afoul of the *Quill* requirement of a "rational relationship" if it unreasonably and arbitrarily attributes to the taxing jurisdiction a percentage of income "out of all appropriate proportion to the business transacted by the appellant in that state." *Hans Rees' Sons*, 283 U.S. at 135, 51 S.Ct. at 389. Based on the affidavit of Wilburt Hinton, Centric asserts that 15.2% of its gross receipts from the Twin Peaks project were attributable to business activities it engaged in outside Marana, including overhead and profit, Denver office management labor, job costs associated with the Denver office, and taxes. Centric urges that Marana's inclusion of 100% of Centric's gross receipts in calculating the tax base was therefore out of all appropriate proportion to the business conducted in the town.

Post-*Hans Rees' Sons* analysis by the Supreme Court demonstrates that Centric is mistaken. In *Moorman Manufacturing Co. v. Bair*, 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978), cited with approval in *Quill*, an Illinois company manufactured animal feed in Illinois and sold about 20% of it in Iowa through Iowa-based salesmen. Iowa's income tax was levied on both domestic and foreign corporations, and was calculated on the portion of a taxpayer's net income that was "reasonably attributable" to its business within Iowa. *Id.* at 269, 98 S.Ct. at 2342.

For income that did not have an easily identifiable geographical source, Iowa used a

formula that calculated Iowa-based income in accordance with the proportion that a taxpayer's Iowa sales bore to its total sales. *Id.* at 270, 98 S.Ct. at 2342–43. The taxpayer contended that this practice resulted in taxation of corporate income actually earned in Illinois rather than in Iowa, and therefore violated its right to due process. *Id.* at 272, 98 S.Ct. at 2343–44. The Court rejected this contention, stating:

> [E]ven were we to assume that the Illinois activities made some contribution to the profitability of the Iowa sales, appellant's claim that the Constitution invalidates an apportionment formula whenever it may result in taxation of some income that did not have its source in the taxing State is incorrect.
>
> . . . .
>
> In individual cases, it is true, the Court has found that the *application* of a single-factor formula to a particular taxpayer violated due process. See *Hans Rees' Sons, Inc. v. North Carolina,* 283 U.S. 123 [51 S.Ct. 385]; *Norfolk & Western R. Co. v. State Tax Comm'n,* 390 U.S. 317 [88 S.Ct. 995, 19 L.Ed.2d 1201 (1968)]. In *Hans Rees',* for example, the Court concluded that proof that the formula produced a tax on 83% of the taxpayer's income when only 17% of that income actually had its source in the State would suffice to invalidate the assessment under the Due Process Clause. But in neither *Hans Rees'* nor *Norfolk & Western* did the Court depart from the basic principles that the States have wide latitude in the selection of apportionment formulas and that a formula-produced assessment will only be disturbed when the taxpayer has proved by "clear and cogent evidence" that the income attributed to the State is in fact "out of all appropriate proportion to the business transacted . . . in that State," 283 U.S. at 135 [51 S.Ct. at

389], or has "led to a grossly distorted result," 390 U.S. at 326 [88 S.Ct. at 1002].

*Id.* at 272–74, 98 S.Ct. at 2343–45.

In this case, the tax base is a percentage of all of Centric's gross income derived from engaging within the town limits in the business of contracting—which by definition consists of "construct[ing], alter[ing], repair[ing]" a "structure, project, development or improvement." Marana Town Code Ch. 14, § 1–100. We seriously question whether many of the off-site costs Centric would allocate as 15.2% of its "contracting" activity in Marana are properly includible as part of that activity. But even assuming the propriety of the allocation, taxing that small portion cannot reasonably be termed "out of all appropriate proportion" to the business Centric transacted in Marana, nor does it lead to "a grossly distorted result." We therefore conclude that application of Marana's transaction privilege tax on Centric's entire gross receipts from the Twin Peaks project did not violate its right to due process.[3]

## Validity of Assessment Under Commerce Clause

■ Centric next contends that Marana's transaction privilege tax violated the Commerce Clause of the U.S. Constitution. In analyzing such claims, the U.S. Supreme Court follows a four-part test it first set forth in *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). In *Quill,* the Court summarized the test this way:

> Under *Complete Auto* 's four-part test, we will sustain a tax against a Commerce Clause challenge so long as the "tax [1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is

---

3. Our pre-*Quill* decision in *City of Phoenix v. West Publishing Co.,* 148 Ariz. 31, 712 P.2d 944 (App.1985), is distinguishable on its facts. There, an out-of-state company had no office or inventory in Phoenix, and only a single sales representative in the city. *Id.* at 32, 712 P.2d at 945. The representative solicited book orders and forwarded them to the taxpayer's home office for action. *Id.* On these facts, we found that

the city lacked the required minimum connection with the company to permit a tax on the sales solicited in Phoenix by the company representative. *Id.* at 36, 712 P.2d at 949. In contrast, Centric maintained a physical presence in Marana for over three years, during which it largely, if not entirely, performed the contract for which the town sought to tax it.

fairly related to the services provided by the State." (citation omitted) 504 U.S. at 311, 112 S.Ct. at 1912. *Accord Goldberg v. Sweet,* 488 U.S. 252, 257–60, 109 S.Ct. 582, 586–88, 102 L.Ed.2d 607 (1989).

We initially acknowledge that the nexus sufficient to satisfy the Commerce Clause must be more substantial than that required to satisfy the "minimum connection" aspect of the Due Process Clause. *See Quill,* 504 U.S. at 313 n. 7, 112 S.Ct. at 1914 n. 7. In support of the contention that its activities lacked "substantial nexus" with the town, Centric again relies on the Hinton affidavit. Centric, however, does not favor us with any explanation why Hinton's affidavit establishes the absence of the required nexus.

When we analyze the U.S. Supreme Court's treatment of this nexus requirement, it becomes apparent that Centric's activities satisfy this requirement. In *D.H. Holmes Co. v. McNamara,* 486 U.S. 24, 108 S.Ct. 1619, 100 L.Ed.2d 21 (1988), the taxpayer was a retailer who maintained several stores in Louisiana with annual sales of over $100 million. In addition, it also maintained a separate catalog business which sent catalogs to potential customers in Louisiana. Louisiana imposed a use tax on the distribution of the catalogs in that state. The taxpayer claimed this tax violated the Commerce Clause since the taxpayer had no control over the distribution of the catalog, which was accomplished by out-of-state printers. The Court relied on the taxpayer's "significant economic presence in Louisiana, its many connections with the State, and the direct benefits it receives from Louisiana in conducting its business" in finding "nexus aplenty" between the state and the activity which was being taxed. *Id.* at 24–33, 108 S.Ct. at 1619–25.

The same factors are present here. Centric had a significant physical presence in Marana and remained there for over three years in completing this contract. It had access to all the town services that any other taxpayer enjoyed, including police and fire protection, road maintenance, traffic control, and the like. These benefits also extended to its sixty-five employees and the fifty employees of its subcontractors. Finally, it generated in excess of $13 million dollars in gross income from its contracting activity in Marana. These factors compel the conclusion that a sufficient nexus existed between Centric's activity and Marana's tax thereon. *See National Geographic Soc'y v. California Bd. of Equalization,* 430 U.S. 551, 556, 97 S.Ct. 1386, 1390, 51 L.Ed.2d 631 (1977) (the taxpayer's maintenance of two offices in California, devoted solely to solicitation of magazine subscriptions, together with other minimal activities, established sufficient nexus to justify imposition of a use tax on the taxpayer's mail order business). *See also Goldberg v. Sweet,* 488 U.S. 252, 260, 109 S.Ct. 582, 588, 102 L.Ed.2d 607, (1989) (excise tax on telecommunications receipts) and *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 617, 101 S.Ct. 2946, 2953, 69 L.Ed.2d 884 (1981) (severance tax on coal mining).

▆ In connection with the fair apportionment prong of the *Complete Auto* test, Centric argues that Marana's tax is not fairly apportioned between Centric's activities in Marana and those in Colorado. We note that the U.S. Supreme Court has consistently viewed state gross receipts taxes as properly apportioned to the taxing jurisdiction alone. In *Moorman Manufacturing Co. v. Bair,* the Court stated:

[I]t would be an exercise in formalism to declare appellant's income tax assessment [based on single-factor apportionment formula] unconstitutional based on speculative concerns with multiple taxation. For it is evident that appellant would have had no basis for complaint if, instead of an income tax, Iowa had imposed a more burdensome gross-receipts tax on the gross receipts from sales to Iowa customers. In *Standard Pressed Steel Co. v. Washington Revenue Dep't,* 419 U.S. 560 [95 S.Ct. 706, 42 L.Ed.2d 719 (1975)], the Court sustained a tax on the entire gross receipts from sales made by the taxpayer into Washington State. Because receipts from sales made to States other than Washington were not included in Standard Pressed Steel's taxable gross receipts, the Court concluded that the tax was " 'apportioned exactly to the activities taxed.' "

437 U.S. at 280, 98 S.Ct. at 2348. Similarly, in *Tyler Pipe Industries, Inc. v. Washington State Dep't of Revenue,* 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987), which concerned the validity of a business and occupations tax on in-state wholesaling, the Court stated:

> Washington taxes the full value of receipts from in-state wholesaling or manufacturing; thus, an out-of-state manufacturer selling in Washington is subject to an unapportioned wholesale tax even though the value of the wholesale transaction is partly attributable to manufacturing activity carried on in another State that plainly has jurisdiction to tax that activity.... Thus, the activity of wholesaling—whether by an in-state or an out-of-state manufacturer—must be viewed as a separate activity conducted wholly within Washington that no other State has jurisdiction to tax.

483 U.S. at 251, 107 S.Ct. at 2822.

As *Moorman* and *Tyler Pipe* make clear, it is entirely proper for Marana to impose its tax on the gross receipts of Centric's contract performed in Marana. This contract activity "must be viewed as a separate activity conducted wholly within [Marana] that no other State has jurisdiction to tax." *Tyler Pipe,* 483 U.S. at 251, 107 S.Ct. at 2822. Accordingly, Marana's tax satisfies the apportionment prong of *Complete Auto.*

■ Regarding the discrimination prong of the *Complete Auto* test, Centric asserts in its opening brief that the tax "discriminates against Centric's interstate commerce activities," but offers no distinct analysis in support of that assertion. Suffice it to say that the tax applies equally to all who engage in taxable business activities within the town limits, regardless of where their central offices may be located. The tax does not burden such activities more heavily when they cross state lines than when they occur entirely within the town limits. *See Fulton Corp. v. Faulkner,* —— U.S. ——, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996). In short, the tax does not discriminate against interstate commerce.

■ Finally, Centric contends that the tax runs afoul of the "fair relationship" prong of *Complete Auto.* Centric again relies on the Hinton affidavit in support of this claim. The affidavit opines that "Marana did not furnish any public benefits to Centric–Jones for which it can fairly ask return, except for possibly the roads...." This opinion is founded on these factors:

> Centric officials did not know that the Twin Peaks project site was in Marana until shortly before it was completed.

> Centric did not use any of the public or private facilities in Marana proper, which were about ten miles away from the project site.

> During the project, Centric personnel saw no evidence that Marana was providing any public benefits at or near the project site.

> When the site was burglarized in August 1987, Centric called the Pima County Sheriff's Office.

> By Hinton's estimate, no more than 10% percent of the Town's general fund budgeted items related to road maintenance.

Centric thus interprets the "fairly related" prong of the *Complete Auto* test as equivalent to a "quid pro quo" requirement. The U.S. Supreme Court's opinion in *Goldberg v. Sweet,* however, makes it clear that this approach is mistaken:

> Finally, we reach the fourth prong of the *Complete Auto* test, namely, whether the Illinois tax is fairly related to the presence and activities of the taxpayer within the State. See *D.H. Holmes,* 486 U.S. at 32–34 [108 S.Ct. at 1624–25]. The purpose of this test is to ensure that a State's tax burden is not placed upon persons who do not benefit from services provided by the State.

> Appellants would severely limit this test by focusing solely on those services which Illinois provides to telecommunications equipment located within the State. We cannot accept this view. The tax which may be imposed on a particular interstate transaction need not be limited to the cost of the services incurred by the State on account of that particular activity. On the contrary, "interstate commerce may be required to contribute to the cost of provid-

ing *all* governmental services, including those services from which it arguably receives no direct 'benefit.'" The fourth prong of the *Complete Auto* test thus focuses on the wide range of benefits provided to the taxpayer, not just the precise activity connected to the interstate activity at issue. Indeed, last Term, in *D.H. Holmes, supra,* at 32 [108 S.Ct. at 1624], we noted that a taxpayer's receipt of police and fire protection, the use of public roads and mass transit, and the other advantages of civilized society satisfied the requirement that the tax be fairly related to benefits provided by the State to the taxpayer.

488 U.S. at 266–67, 109 S.Ct. at 592 (some citations omitted).

In this case, Centric benefitted from its presence in Marana by performing and profiting from a thirteen million dollar construction contract. In the course of this performance, Centric also benefitted from Marana's road maintenance services, or at least from its assumption of the obligation to provide such services. Although Centric did not take advantage of other town services, whether due to lack of need or to ignorance of its right to do so, Marana's general governmental protection was nevertheless available to Centric and its work force while they remained within town limits. We therefore conclude that Marana's tax did not lack the required "fair relationship" to the services provided by the town.

**Centric's Business Activities as Exempt "Casual Activity"**

■ Centric contends that even if Marana's transaction privilege tax is valid, the contract proceeds from its work on the Twin Peaks Pumping Station were not subject to the tax because its performance of the contract in Marana constituted "casual activity." Marana's tax for prime contractors applies to those who engage in the taxable business activity of construction within the town limits. Marana Town Code, Ch. 14, § 1–415(a). "Business" is defined as including "all activities or acts, personal or corporate, engaged

in and caused to be engaged in with the object of gain, benefit, or advantage, either direct or indirect, but not casual activities or sales." Marana Town Code, Ch. 14, § 1–100. The definition of "casual activity or sale" provides in pertinent part:

"Casual activity or sale" means a transaction of an isolated nature made by a person who neither represents himself to be nor is engaged in a business subject to a tax imposed by this Chapter.... This definition shall include sales of used capital assets, provided that the volume and frequency of such sales do not indicate that the seller regularly engages in selling such property.

*Id.*[4]

Centric first refers us to section 1–415 of Marana's taxing ordinance. This section assesses the tax against prime contractors "upon every construction contractor engaging or continuing in the business activity of construction contracting *within the Town.*" (Emphasis added.) Relying on this emphasized language, Centric argues that whether its contract was "casual" must be determined only from its business activities within the town and cannot include its activities elsewhere within Arizona. Centric then argues that it was in Marana only temporarily, for the single purpose of performing an isolated construction contract. Moreover, it did not hold itself out to the public as being engaged in the contracting business in Marana. Therefore, Centric concludes, its activities in Marana qualify as "casual" under section 1–100.

Marana responds that the exemption for "casual activity" is designed to exclude from the tax a transaction which is isolated in the sense that it is not within the taxpayer's regular course of business. If the transaction is of the nature in which the taxpayer regularly engages, it is not exempted even if it is the only transaction entered into within the taxing jurisdiction. Since Centric was a partnership formed expressly for the purpose of contracting, and admittedly was in the business of contracting within Arizona, as

---

4. The parties agree that the definition of "casual activity or sale" contained in the current ordinance is dispositive of this issue as to taxes imposed under both the former ordinance and the current ordinance.

evidenced by its activities in Mesa, Tucson, Phoenix and Scottsdale, its contract in Marana means it was engaged in a taxable business in Marana as well.

Centric relies on the case of *Arizona Department of Revenue v. Mountain States Telephone and Telegraph Co.*, 113 Ariz. 467, 556 P.2d 1129 (1976) for the proposition that only its activities in Marana, and not elsewhere, determine whether it engaged in a business subject to the Marana tax. In that case, our supreme court inquired whether certain sale and lease transactions entered into by Mountain Bell concerning telephone equipment were subject to the state transaction privilege tax. In those days of regulated monopolies, Mountain Bell normally retained ownership of all equipment installed in homes or businesses and rarely sold such equipment to customers. At one point, however, it did sell and lease the components of an installed system to the U.S. Army and the state sought to collect an excise tax. The supreme court held the transaction was not subject to the tax because the sale and lease were "unanticipated and isolated" and therefore qualified for the "casual activity or sale[s]" exemption. *Id.* at 467–69, 556 P.2d at 1129–31.

Centric urges that since the *Mountain States* court made no mention that it was considering Mountain Bell's activities in other states, as well as in Arizona, in determining that the subject sale and lease were casual, the case therefore stands for the proposition that only activities within the specific taxing jurisdiction are relevant in determining whether the business was casual. We disagree that this principle can be inferred from *Mountain States.* First, when an issue was not even mentioned in a case and does not appear to have been necessary to its result, we are reluctant to deduce a holding on that issue from the case. Second, the consequences of such a deduction would permit an entity like Centric to perform single, multi-million dollar contracts in every municipality in Arizona, yet escape taxation in those locales simply because, when measured only by its activity in that locale, its contracting was of an "isolated nature." We do not think that *Mountain States*

should be interpreted to require such a result.

We conclude that Marana's position is correct. Under section 1–415, if the taxpayer is by nature a contractor, and performs a construction contract within the town limits, it is engaged in a taxable business activity within the meaning of section 1–100 and is not exempted as a casual activity simply because it is a single contract. Centric meets these criteria and is not entitled to the casual activity exemption.

**Exemptions in Town's Former Taxing Ordinance**

■ Centric next argues that it is entitled to a recalculation of its tax liability. It first notes that under Marana's former ordinance, there were certain exemptions available which would apply to a portion of its contract. It then argues that it is entitled to these exemptions for the full contract, notwithstanding the deletion of these exemptions with the passage of the current ordinance, because of the particular accounting method it used. Marana disputes Centric's analysis and argues to the contrary, but since we resolve the question based on our construction of the exemption section, we need not address this preliminary issue.

The exemptions to which Centric refers were contained in former section 79.03–4:

> The following shall not be subject to taxation under this article:
>
> . . . .
>
> G. Sales of tangible personal property made directly to the United States Government, its departments or agencies, by the manufacturer, modifier, assembler or repairer. A deduction of fifty percent shall be permitted where such sales are made by persons other than those specified in the previous sentence.
>
> . . . .
>
> S. Sales of pipes or valves four inches in diameter or larger to be used for transporting oil, natural gas, artificial gas, water or coal slurry.

Centric states that of its $13.161 million in CAP contract proceeds, $5.437 million related to the sale of tangible personal property to a

U.S. Government agency and $1.787 million related to sales of pipes or valves of four inches or more in diameter to be used for transporting water. It argues that it was entirely exempt from taxation on the water pipe sales pursuant to subsection (S) and exempt from taxation on 50% of government sales pursuant to subsection (G).

Centric's argument depends on its theory that it actually "sold" to the CAP the tangible personal property used to perform its contractual obligations. It argues that it did so because former section 79.03–1(W) defined "sale" as "any transfer of title or possession ... by any means whatsoever." Centric argues that under Arizona law, a contract to sell property equitably transfers such property and, as such, is a type of "any transfer ... in any manner or by any means."

Centric's argument collapses on analysis. A construction contract is not "a contract to sell property." It is a contract to "construct, alter, [or] repair" a "structure, project, development or improvement." Former § 79.03–1(E). In interpreting a similar exemption provision in the Excise Tax Act of 1935 as applied to a contractor, our supreme court stated:

> The exemption statute, [Ariz.Code. Ann. section] 73–1308, in so far as pertinent states: "The taxes herein levied shall not be construed to apply to ... any sales made to the United States Government, its departments or agencies...."
>
> ....
>
> The statute exempting sales to the United States from taxation is then applicable to this plaintiff, if, and only if he actually made a sale of tangible personal property to the government. That question now becomes the crux of the matter in so far as plaintiff's right to a recovery is concerned.
>
> ....
>
> When a contractor fabricates his materials for the contractee, and the completed structure is erected on the owner's land, it is as much real property as the land itself. The constituent elements of tangible personal property have been destroyed by their incorporation into the completed structure. And such a contractor, there-fore, is not making a sale of tangible personalty to his contractee.

*Duhame v. State Tax Comm'n,* 65 Ariz. 268, 278–79, 179 P.2d 252, 262–63 (1947). *Accord Brink Elec. Const. Co. v. Arizona Dep't of Revenue,* 184 Ariz. 354, 909 P.2d 421 (App. 1995) (interpreting analogous provisions of A.R.S. §§ 42–1310.01 and 42–1310.16).

The *Duhame* analysis applies here. The exemptions claimed by Centric were not for items of tangible property or pipes and valves which were sold separately from the CAP contract. Rather, they were items incorporated into the completed pumping station and thus became part and parcel of that real estate when delivered to the government. Under *Duhame,* Centric is entitled to neither of the claimed exemptions.

## CONCLUSION

We find that Marana's imposition of a transaction privilege tax on Centric's gross receipts from the CAP contract is valid. The judgment of the tax court is therefore affirmed.

FIDEL, P.J., and LANKFORD, J., concur.