44 P.3d 1006

SOUTHERN PACIFIC TRANSPORTATION COMPANY, INC., a Delaware corporation, Plaintiff–Appellant, Cross–Appellee,

v.

STATE of Arizona, DEPARTMENT OF REVENUE, Defendant–Appellee, Cross–Appellant,

Town of Clifton, Defendant Appellee.

No. 1 CA–TX 00–0024.

Court of Appeals of Arizona, Division 1, Department T.

April 25, 2002.

328

Fennemore Craig, P.C., By Paul J. Mooney, David T. Cox, William S. Gates, Kendis K. Muscheid, Phoenix, Attorneys for Plaintiff–Appellant, Cross–Appellee Southern Pacific.

Janet Napolitano, Attorney General, By Sara D. Branscum, Assistant Attorney General, Phoenix, Attorneys for Defendant–Appellee, Cross–Appellant State of Arizona.

Gust Rosenfeld, P.L.C., By Jill D. Winans, Tucson, Attorneys for Defendant–Appellee Town of Clifton.

GARBARINO, Judge.

¶ 1 A portion of Southern Pacific Transportation Company's gross income is earned by transporting copper concentrate from the Town of Clifton to other points in Arizona over a railroad route that exits and then re-enters Arizona's boundaries. Southern Pacific appeals from a summary judgment in favor of the Arizona Department of Revenue (ADOR) and the Town of Clifton that partially sustained assessments of delinquent transaction privilege taxes imposed on these gross receipts under the transportation classification, Arizona Revised Statutes (A.R.S.) section 42–5062 (Supp.2001),[1] and section 9–475 of Clifton's version of the Model City Tax Code.[2] ADOR cross appeals from the judg-

---

1. During the audit period, from September 1, 1985 to May 31, 1989, and from October 1, 1989 to August 31, 1993, Arizona's transaction privilege tax on the business of providing transportation services from point to point in Arizona was governed by former A.R.S. § 42–1307(A)(1) and later by former A.R.S. § 42–1310.02(A). The substance of the taxing provision has remained the same. To facilitate application of this opinion in future cases, we use the current numbering.

2. All of the parties' arguments on appeal focus on the provisions of A.R.S. § 42–5062(A). ADOR has made no arguments unique to Clifton Town Code § 9–475. The Town has joined in ADOR's

ment to the extent it held that ADOR's original assessment had to be proportionately reduced to exclude from taxation any sums attributable to mileage traveled outside Arizona. The Town of Clifton filed no cross-appeal. The appeal and cross-appeal present these issues:

1. Whether Article 1, Section 8, Clause 3 of the United States Constitution (the Commerce Clause) requires apportionment of state and local business privilege taxes on gross receipts from transportation services between points in Arizona when approximately twenty percent of the route is located in a neighboring state;

2. If apportionment is required, whether Arizona law authorizes the apportionment of such taxes;

3. If so, whether court-ordered retroactive apportionment of such taxes comports with due process; and

4. If so, whether apportionment may be based solely on the percentage of track miles outside the boundaries of Arizona.

### FACTUAL AND PROCEDURAL HISTORY

¶ 2 The Clifton Branch is a railroad line that runs between Clifton, Arizona, and Lordsburg, New Mexico. Lordsburg was a crew-change point on the Transcontinental Railroad Line through New Mexico before the Clifton Branch began operation under Southern Pacific's ownership in 1884. The Clifton Branch was built to avoid the mountainous terrain immediately south and west of Clifton and to take advantage of the existing Southern Pacific facilities in Lordsburg.

¶ 3 Southern Pacific's facility at Clifton consisted of a single depot. All four or five of Southern Pacific's employees who worked on the Clifton Branch during the audit period were based in Lordsburg. Southern Pacific's facility at Lordsburg included a yard office building, a crew room, a locker room, housing facilities, storage rooms, and fueling facilities.

¶ 4 During the audit period, Phelps Dodge was Southern Pacific's only customer on the Clifton Branch. Using its own separate railroad line, Phelps Dodge transported railroad cars loaded with copper concentrate from its Morenci mine to Clifton for shipment to Phelps Dodge smelters in Arizona and New Mexico. At Clifton, Southern Pacific attached Phelps Dodge's cars to its own trains and pulled them to Lordsburg. At Lordsburg, Southern Pacific uncoupled the Arizona-bound cars and re-coupled them to trains that originated in El Paso, Texas. Once in Arizona these cars were rerouted for delivery to the Phelps Dodge smelters at Miami, San Manuel, Hayden, and Douglas.

¶ 5 Southern Pacific's routes from Clifton to Arizona smelters each covered 52.9 miles within New Mexico. This New Mexico mileage ranged from 17.46% to 21.31% of the total mileage from Clifton to the four respective Arizona smelters.

¶ 6 For the audit period, ADOR assessed delinquent Arizona and Town of Clifton transaction privilege taxes against Southern Pacific on its gross receipts from shipping that originated in Clifton and terminated at Arizona smelters. Southern Pacific challenged the assessments unsuccessfully before ADOR and the Arizona Board of Tax Appeals, and commenced judicial appeals that were consolidated before the tax court. On cross-motions for summary judgment, the tax court held that ADOR and the Town of Clifton could impose their transaction privilege taxes on Southern Pacific's gross receipts earned in shipping from Clifton to Arizona smelters via Lordsburg, but that the taxes had to be reduced by the percentages representing New Mexico mileage. From formal judgment in accordance with the tax court's rulings, Southern Pacific appeals and ADOR cross-appeals. We have appellate jurisdiction. A.R.S. § 12–2101(B) (1994).

### DISCUSSION

I. *Standard of Review*

¶ 7 The dispositive questions in this appeal are pure issues of law. On appeal from a summary judgment in which the ma-

---

answering brief on appeal and offered no argument of its own. No claim is made that language specific to Code § 9–475 would yield any

different result on any issue raised in this case. We accordingly refer to A.R.S. § 42–5062(A) as the backdrop for our discussion of the issues.

terial facts are not in dispute, we review the issues of law de novo and determine only whether the tax court correctly applied the law to the undisputed facts. *Brink Elec. Constr. Co. v. Arizona Dep't of Revenue,* 184 Ariz. 354, 358, 909 P.2d 421, 425 (App.1995).

## II. *Apportionment of Transportation Transaction Privilege Tax*

### A. *Commerce Clause—Background Principles*

¶ 8 The Commerce Clause authorizes Congress to "regulate Commerce . . . among the several States. . . ." U.S. Const. art. 1, § 8, cl. 3. The United States Supreme Court has ascribed to the Commerce Clause the goal of "preventing a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 179–80, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995). The Supreme Court has always interpreted the Commerce Clause to prohibit a state from using its taxing authority to burden the flow of interstate commerce. Because this is an interpretation of the Commerce Clause not apparent from the face of the Constitution, it has been referred to as "the dormant Commerce Clause." *Id.* at 179, 115 S.Ct. 1331.

■ ¶ 9 Modern dormant Commerce Clause principles were defined in a four-part test suggested in *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), and first recognized and applied by the Supreme Court in *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 617, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981). That test considers the practical effect of the tax statute in question and proposes to "sustain[ ] a tax against [a] Commerce Clause challenge when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Complete Auto,* 430 U.S. at 279, 97 S.Ct. 1076. Only the second prong of the *Complete Auto* test, requiring "fair ap-

portionment" of the tax in question, is at issue in this appeal.

■ ¶ 10 The Supreme Court determines whether a state tax on interstate commercial activity "is fairly apportioned by examining whether it is internally and externally consistent." *Goldberg v. Sweet,* 488 U.S. 252, 261, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989); *see also Jefferson Lines,* 514 U.S. at 185, 115 S.Ct. 1331; *Container Corp. of Am. v. Franchise Tax Bd.,* 463 U.S. 159, 169, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983). A state tax is internally consistent if "the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear." *Jefferson Lines,* 514 U.S. at 185, 115 S.Ct. 1331. The internal consistency test "simply looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate." *Id.*

■ ¶ 11 By contrast, the external consistency test looks at the in-state business activity that causes the state to impose its tax and the practical or economic effect of the tax to determine "whether the State has taxed only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed." *Goldberg,* 488 U.S. at 262, 109 S.Ct. 582. Under external consistency analysis, "the threat of real multiple taxation (though not by literally identical statutes) may indicate a State's impermissible overreaching." *Jefferson Lines,* 514 U.S. at 185, 115 S.Ct. 1331.

### B. *Application of Apportionment Principles*

¶ 12 We first address ADOR's cross-appeal. ADOR argues that its assessment under A.R.S. § 42–5062(A) properly encompassed Southern Pacific's entire gross receipts from transportation services between Clifton and smelters in Arizona, and that the tax court erred by holding otherwise. ADOR contends that non-apportionment of taxes on these gross receipts does not un-

duly burden interstate commerce and that Southern Pacific failed to establish that any portion of those receipts was subject to multiple taxation.

¶ 13 ADOR principally relies on *Central Greyhound Lines of New York, Inc. v. Mealey,* 334 U.S. 653, 68 S.Ct. 1260, 92 L.Ed. 1633 (1948), for the proposition that the tax does not place an undue burden on interstate commerce. In *Central Greyhound,* the Supreme Court invalidated a New York business privilege tax as applied to the unapportioned gross receipts of a bus company that sold tickets in New York for transportation services rendered over a route that covered ground in New Jersey and Pennsylvania as well as New York. In the course of its opinion, the Supreme Court stated,

> To say that this commerce is confined to New York .... does not eliminate the relation of Pennsylvania and New Jersey to the transactions nor eliminate the benefits which those two States confer upon the portions of the transportation within their borders.... There is no suggestion here that the interstate routes were utilized as a means of avoiding even in part New York's taxation. We are not dealing with a necessary deviation or a calculated detour. Nor is New York seeking to tax transactions physically outside its borders but so trifling in quantity to the New York commerce, of which they form a part, as to be constitutionally insignificant. New York seeks to tax the total receipts from transportation of which nearly 43% of the mileage lay in New Jersey and Pennsylvania. Transactions which to such a substantial extent actually take place in New Jersey and Pennsylvania cannot be deemed legally to take place in New York.
>
> Of course we are dealing here with "interstate commerce."

334 U.S. at 660–61, 68 S.Ct. 1260 (citations omitted).

¶ 14 ADOR argues that under *Central Greyhound,* no apportionment is required because the passage of Southern Pacific's route through New Mexico was a "necessary deviation," and formed a much smaller portion of the total route than did the taxpayer's non-New York mileage in *Central Greyhound.*

We conclude, however, that *Central Greyhound* does not support ADOR's analysis.

¶ 15 ADOR appears to assume from the "necessary deviation" language of *Central Greyhound* that as a matter of law, providing transportation services over an intrastate transportation route that passes over another state's territory by geographic necessity may never amount to interstate commerce requiring apportionment of the transportation operator's gross receipts. We find nothing in *Central Greyhound* to support that view. The Supreme Court's use of the term "deviation" and its context within the *Central Greyhound* opinion strongly suggest that the Court had in mind only the situation in which transportation services over an existing intrastate route are temporarily interrupted and the only available detour passes through the territory of another state. Neither the *Central Greyhound* court nor ADOR refer to any authority that supports the far broader proposition that ADOR promotes. As the Supreme Court stated,

> In a case like this nothing is gained, and clarity is lost, by not starting with recognition of the fact that it is interstate commerce which the State is seeking to reach and candidly facing the real question whether what the State is exacting is a constitutionally fair demand by the State for that aspect of the interstate commerce to which the State bears a special relation.

334 U.S. at 661, 68 S.Ct. 1260.

¶ 16 ADOR nevertheless contends that apportionment is unnecessary because, compared to the route under scrutiny in *Central Greyhound,* only a trifling proportion of Southern Pacific's route from Clifton to Arizona smelters passed through New Mexico. ADOR argues that the transportation services that Southern Pacific performed in New Mexico were therefore "constitutionally insignificant." Again we must disagree.

¶ 17 First, even if we were only to consider mileage percentages to measure constitutional significance, one-fifth of the total route mileage in this case is more than a mere "trifle." We must keep in mind that the issue is whether Arizona's assessment against Southern Pacific's entire gross re-

**332**

ceipts reasonably reflects the in-state component of the transportation services that it provides over its shipping routes between Clifton and smelters in Arizona. Just taking into consideration the Arizona mileage component of each trip does not take into account the extensive and necessary services that Southern Pacific renders at its facility in Lordsburg, New Mexico in aid of each shipping transaction. All of these services constitute business activity in support of Southern Pacific's shipments from Clifton to Arizona smelters, and all take place outside Arizona. Considering mileage and services together, the New Mexico components of Southern Pacific's transportation services plainly cannot be characterized as "constitutionally insignificant."

▪ ¶18 ADOR nevertheless argues that as applied to Southern Pacific, the tax under A.R.S. § 42–5062(A) need not be apportioned because it passes both the internal and external consistency tests. We agree that Arizona's transportation services tax is internally consistent. A hypothetical New Mexico privilege tax on the business of transporting goods or people from point to point in New Mexico would necessarily be inapplicable to transportation originating and terminating at points in Arizona.

¶19 The question whether the transportation services tax under A.R.S. § 42–5062(A) also passes the external consistency test, however, is a different matter. ADOR relies on *Goldberg*, 488 U.S. at 262–64, 109 S.Ct. 582, *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 463, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959), and *Department of Revenue v. Moki Mac River Expeditions, Inc.*, 160 Ariz. 369, 376, 773 P.2d 474, 481 (App.1989), *overruled on other grounds by Wilderness World, Inc. v. Department of Revenue*, 182 Ariz. 196, 895 P.2d 108 (1995), for the proposition that a state's tax on interstate commerce must be deemed externally consistent unless the aggrieved taxpayer establishes that "a multiple tax burden actually exists." ADOR asserts that the external consistency test's objective "is to determine whether the activity being taxed by one State is also being taxed by another State," and that Southern Pacific has made no showing that New Mexico actually taxes Southern Pacific on gross receipts attributable to its services in that state on shipments from Clifton to Arizona smelters.

¶20 The governing case law does not support ADOR's interpretation of modern dormant Commerce Clause principles. *Northwestern States Portland Cement* examined only whether states could tax the net income of foreign corporations "earned from *and fairly apportioned to business activities within the taxing State* when those activities are exclusively in furtherance of interstate commerce." 358 U.S. at 452, 79 S.Ct. 357 (emphasis added). The Supreme Court held that they could. Neither the need for apportionment nor the correctness of any apportionment method was at issue in that case. *Id.*

¶21 The portion of the *Northwestern* opinion on which ADOR specifically relies concerns a taxpayer's assertion that as a practical matter the use of non-uniform apportionment formulas by different states could potentially result in multiple taxation. *Id.* at 462, 79 S.Ct. 357. The Supreme Court acknowledged the truth of this proposition, but rejected the taxpayer's argument that the dormant Commerce Clause should therefore be read to prohibit even a fairly apportioned state income tax on business activities in interstate commerce. *Id.* The Court held instead that in the context of a "fairly apportioned" state net income tax like the one before it, the mere possibility that a portion of the taxpayer's income would be doubly taxed due to another state's differing apportionment formula was insufficient to demonstrate a constitutionally significant burden on interstate commerce. In that situation, said the Court, the taxpayer was required to demonstrate actual multiple taxation. 358 U.S. at 462–63, 79 S.Ct. 357.

▪ ¶22 This case is quite different. Neither A.R.S. § 42–5062(A) on its face nor ADOR's audit assessment even purported to be "apportioned," fairly or not. Indeed, the proposition central to ADOR's cross-appeal is that the State of Arizona was entitled to tax the entire gross receipts from Southern Pacific's transportation services between Clifton and Arizona smelters with no apportionment

at all. Under those circumstances, the *Northwestern* language on which ADOR relies is inapplicable, and Southern Pacific was not required to demonstrate actual multiple taxation.[3]

¶ 23 The more recent decision in *Goldberg*, 488 U.S. at 262–64, 109 S.Ct. 582, likewise fails to support ADOR's position. *Goldberg* concerned whether a tax on interstate telephone calls that originated or terminated in Illinois and were charged to an Illinois service address was "fairly apportioned" for Commerce Clause purposes. *Id.* at 256, 261, 109 S.Ct. 582. It is true, as ADOR points out, that the *Goldberg* court reiterated the principle that a "limited possibility of multiple taxation ... is not sufficient to invalidate" a tax on interstate commerce. *Id.* at 264, 109 S.Ct. 582. The context in which the Supreme Court did so, however, was far different than the circumstances in this case.

¶ 24 In *Goldberg*, the Court noted that if a taxpayer's telephone service address and billing location were "in different States, some interstate telephone calls could be subject to multiple taxation." *Id.* at 263, 109 S.Ct. 582. The Court found this possibility insufficient to invalidate the Illinois tax, however, because the Illinois Tax Act contained a credit provision that operated to avoid actual multiple taxation. *Id.* at 264. There appears to be no analogous credit provision in Arizona law that would avoid multiple taxation under A.R.S. § 42–5062(A).

¶ 25 Moreover, the fundamental nature of the tax itself is akin to a business privilege tax on gross receipts, requiring apportionment, rather than a "sales" tax. The burden of a transaction privilege tax, like the one that A.R.S. § 42–5062(A) imposes, is on the operator of the business in question. In general, such taxes are measured by the taxpayer's gross receipts from the taxable business activity. *See* A.R.S. §§ 42–5010,

42–5061(A) (Supp.2001). Although the liability for the tax is the business operator's, the operator may typically pass the tax through to its customers. *See* A.R.S. § 42–5002(A)(1) (1999).

¶ 26 Although true "sales" taxes have a similar appearance and effect, they are substantively distinct from transaction privilege taxes. In contrast to a transaction privilege tax, the burden of a true sales tax is on the purchaser. Although the business operator with whom the purchaser deals is typically required to collect the tax from the purchaser and remit it to the taxing authority, the operator does not personally owe it. *Arizona State Tax Comm'n v. Garrett Corp.*, 79 Ariz. 389, 391, 291 P.2d 208, 209 (1955).

¶ 27 The United States Supreme Court has made it clear that a sales tax that is paid in the taxing state on an interstate transaction need not be apportioned, but that an income, gross receipts, or transaction privilege tax on such a transaction will violate the Commerce Clause in the absence of fair apportionment. *See Jefferson Lines*, 514 U.S. at 188–91, 115 S.Ct. 1331. In *Jefferson Lines*, the Court addressed the question whether an Oklahoma retail sales tax violated the Commerce Clause as applied to the entire proceeds of bus ticket sales for travel from Oklahoma to destinations in other states. The Court held that it did not. *Id.* at 200, 115 S.Ct. 1331.

¶ 28 The *Jefferson Lines* court observed that, in contrast to the approach it has taken towards the taxation of business income from interstate activities, it has "consistently approved taxation of sales without any division of the tax base among different States, and [has] instead held such taxes properly measurable by the gross charge for the purchase, regardless of any activity outside the taxing jurisdiction that might have preceded the sale or might occur in the future." *Id.* at 186, 115 S.Ct. 1331. The *Jefferson Lines*

---

3. The situation in *Moki Mac* was broadly analogous to that in *Northwestern*. In *Moki Mac*, Arizona sought to tax gross receipts from conducting river expeditions in Arizona. *Id.* at 371, 773 P.2d at 476. The taxpayer argued that under a provision in the Utah Tax Code, Utah might also seek to tax the Arizona gross receipts. *Id.* at 376, 773 P.2d at 481. Citing *Northwestern*, we rejected the taxpayer's argument that this limited possibility was sufficient to disqualify Arizona's tax as fairly apportioned. *Id.* Moreover, apart from the question whether *Moki Mac* is distinguishable here to the same extent as is *Northwestern*, we note that to the degree the *Moki Mac* analysis might be viewed as inconsistent with the United States Supreme Court's later decision in *Jefferson Lines*, the *Jefferson Lines* analysis would clearly govern.

court stated that a sales tax imposed on the buyer for purchases of services can ordinarily be treated as a local state event and that such "sales with at least partial performance in the taxing State justify that State's taxation of the transaction's entire gross receipts in the hands of the seller." *Id.* at 189, 115 S.Ct. 1331.

¶ 29 Although the *Jefferson Lines* court acknowledged the "striking" similarity between the situation in *Jefferson Lines* and that in *Central Greyhound,* it held that because *Central Greyhound* concerned a gross receipts tax on a business, rather than a sales tax on a purchaser, *Central Greyhound* did not resolve the apportionment issue that the Court now faced. The Court explained:

> [T]he two [cases] diverge crucially in the identity of the taxpayers and the consequent opportunities that are understood to exist for multiple taxation of the same taxpayer. *Central Greyhound* did not rest simply on the mathematical and administrative feasibility of a mileage apportionment, *but on the Court's express understanding that the seller-taxpayer was exposed to taxation by New Jersey and Pennsylvania on portions of the same receipts that New York was taxing in their entirety. The Court thus understood the gross receipts tax to be simply a variety of tax on income, which was required to be apportioned to reflect the location of the various interstate activities by which it was earned.*

*Id.* at 190, 115 S.Ct. 1331 (emphasis added).

■■■ ¶ 30 A prominent treatise has stated: While *Jefferson Lines* sustained states' power to impose unapportioned retail sales taxes on the sale of services involving interstate activities, it strengthened taxpayers' ability to assert the position that gross receipts taxes imposed on business activity must be fairly apportioned if they are measured by receipts from interstate business activity. By drawing a sharp line between

gross receipts taxes and retail sales taxes and characterizing the gross receipts tax in *Central Greyhound Lines, Inc. v. Mealey,* as akin to an income tax, the Court has called into question some of its earlier decisions that approved, with little analysis, unapportioned gross receipts taxes merely because they were imposed on a "local" subject and could loosely be analogized to retail sales taxes.

2 Jerome R. Hellerstein & Walter Hellerstein, *State Taxation* ¶ 18.08[5], at 18–65 to –66 (3d ed.1998) (footnote omitted).[4] In our view, *Jefferson Lines* compels the view that gross receipts taxes like the transaction privilege tax imposed by A.R.S. § 42–5062(A) must be apportioned to comply with the dormant Commerce Clause.

¶ 31 Because of the sharp distinction that *Jefferson Lines* has drawn between state sales and gross receipts taxes, ADOR's reliance on *Centric–Jones Co. v. Town of Marana,* 188 Ariz. 464, 937 P.2d 654 (App.1996), is misplaced. That case concerned an unapportioned municipal transaction privilege tax measured by the taxpayer's gross receipts from contracting activities within the Marana town limits. We held that the tax did not run afoul of the "fair apportionment" requirement of *Complete Auto* as applied to the taxpayer, even though some 15.2% of the gross receipts were attributable to business activities in which the taxpayer engaged outside Marana. *Id.* at 472–75, 937 P.2d at 662–65.

¶ 32 *Centric–Jones* did not cite or discuss the Supreme Court's then-recent opinion in *Jefferson Lines.* It relied on pre-*Jefferson Lines* decisions for the proposition that "the U.S. Supreme Court has consistently viewed state gross receipts taxes as properly apportioned to the taxing jurisdiction alone." *Id.* at 474, 937 P.2d at 664. The Hellerstein treatise cites two of these decisions, *Tyler Pipe Industries* and *Standard Pressed Steel*

---

**4.** As examples of earlier Supreme Court decisions that *Jefferson Lines* calls into question, the Hellerstein treatise cites *Tyler Pipe Industries, Inc. v. Washington State Department of Revenue,* 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987), *Standard Pressed Steel Co. v. Washington Department of Revenue,* 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975), and *General Motors Corp. v. Washington,* 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964) (*overruled by Tyler Pipe Industries,* 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987)). Hellerstein & Hellerstein, *supra,* at 18–66 n. 267.

*Co.,* as doubtful authority in the wake of *Jefferson Lines.* Hellerstein & Hellerstein, *supra,* at 18–66 n. 267. We accordingly question the continued validity of the discussion of fair apportionment of gross receipts taxes contained in *Centric–Jones.*

### III. *Authorization for Apportionment*

¶ 33 In order for A.R.S. § 42–5062(A) to have validity in this case, the dormant Commerce Clause requires the tax to be fairly apportioned. The tax court found that, as a matter of construction, the Arizona statute permitted apportionment of the tax as between transportation services that Southern Pacific performed within and without the territorial limits of the state. Following our decision in *City of Prescott v. Town of Chino Valley,* 163 Ariz. 608, 790 P.2d 263 (App. 1989), *affirmed in part and vacated in part on other grounds,* 166 Ariz. 480, 803 P.2d 891 (1990), the tax court in this case elected to apportion the tax on its own authority to comply with constitutional requirements. The tax court cited as authority *Central Greyhound,* 334 U.S. at 663–64, 68 S.Ct. 1260, for the proposition that apportionment to avoid violation of the dormant Commerce Clause "is a matter for the courts to determine."

¶ 34 Southern Pacific argues that the tax court erred and points out that neither the Arizona statutes nor the Clifton Town Code expressly authorizes apportionment of the Arizona or Clifton transaction privilege taxes. Southern Pacific further urges that by repealing the supplementary excise on interstate transportation in former § 3138(c)(9) of the Excise Revenue Act of 1935, later codified as Arizona Code Annotated (A.C.A.) § 73–1303(c)(9) (1939),[5] under which the tax was to be apportioned based on the proportion of mileage traveled within this state, the legislature demonstrated its intention to preclude apportionment of transportation services taxes after 1954.

■ ¶ 35 There are several reasons why we disagree with ADOR's contention and the tax court's ruling that there is a legal basis to apportion the tax imposed by A.R.S. § 42–5062(A). First, ADOR does not dispute that neither the Arizona transaction privilege tax statutes nor the Clifton taxing ordinance expressly authorizes apportionment of transportation services taxes over interstate routes. As Southern Pacific points out, Arizona has specifically provided for apportionment of other taxes that might reach gross receipts or income generated in interstate commerce. *E.g.,* A.R.S. § 43–1091 (1998) (gross income of a nonresident); A.R.S. § 43–1132(A) (Supp.2001) (Arizona corporate income taxes); former A.R.S. § 28–1599.05(B) (Supp.1997) (repealed 1995) (motor carrier tax). The absence of any similar apportionment provision applicable to the tax imposed by A.R.S. § 42–5062(A) should not be viewed as mere happenstance.

¶ 36 Second, contrary to ADOR's argument, *Central Greyhound* did not hold that apportionment could be ordered without state legislative authority. At the close of its opinion, the *Central Greyhound* court said, "Both appellant and appellee have indicated here that, as a matter of construction, the statute under consideration permits such apportionment [by mileage traveled in-and out-of-state], but that is a matter for the New York courts to determine." 334 U.S. at 663–64, 68 S.Ct. 1260. As Southern Pacific notes in its Reply Brief, "Even in light of [the parties'] agreement, the [*Central Greyhound* ] Court remanded to have the statute reviewed." The *Central Greyhound* court recognized that the scope and applicability of state taxing statutes is strictly a matter of state statutory law.

¶ 37 ADOR argues that *City of Prescott* supports its position. In that case, the City of Prescott operated a water pipeline within the Chino Valley town limits. 163 Ariz. at 610, 790 P.2d at 265. Chino Valley imposed a one percent transaction privilege tax on Prescott's gross receipts from transporting water through the pipeline to all points within or outside the town limits. *Id.* at 611, 790 P.2d at 266. Although only two miles of the seventeen-mile pipeline between the two mu-

---

**5.** Arizona Code Annotated § 73–1303(c)(9) was later renumbered as A.C.A. § 73–1303(b)(9) (Supp.1952), and repealed in 1954.

nicipalities were in Chino Valley, *id.* at 610, 790 P.2d at 265, Chino Valley determined administratively that a full eight-tenths of one percent of the gross sales receipts from water transported for consumption outside Chino Valley would be taxed. *Id.* at 618, 790 P.2d at 273.

¶ 38 On appeal from a judgment sustaining the tax, Prescott argued that the Chino Valley tax was unconstitutionally applied "because it has not been apportioned, or reasonably apportioned." 163 Ariz. at 618, 790 P.2d at 273.[6] The court agreed with Prescott. The court also said,

> Prescott argues that because the Chino Valley tax is misapportioned, it is void. *Shell Oil* upon which Prescott most heavily relies directed court-determined apportionment. Prescott cites no authority voiding a measure such as this one, measured by increment of volume and not void upon its face. We think the *Shell* result of apportionment should follow in this case.

163 Ariz. at 620, 790 P.2d at 275.

¶ 39 This language from *City of Prescott* on its face appears to support ADOR's interpretation of that case, but in reality it does not. Unlike the situation here, in *City of Prescott*, there was no question whether Chino Valley's assessment was invalid because the town's municipal code did not authorize apportionment of the tax. Chino Valley's transaction privilege tax code expressly authorized the Chino Valley Town Clerk to adopt regulations for apportioning transaction privilege taxes when constitutionally necessary. Town of Chino Valley former Transaction Privilege Tax Code § 5(C). Similarly, the municipal taxing provision at issue in *Shell Oil*, on which *City of Prescott* relied in directing judicial reapportionment on remand, contained a virtually identical provision. *Shell Oil*, 93 Cal.Rptr. 1, 480 P.2d at 956 n. 4. In this case, neither the Arizona transaction privilege tax statutes nor the

Clifton taxing ordinance contains a provision authorizing the apportionment of transportation services taxes over interstate routes.

¶ 40 Up to this point, we have only focused on whether sufficient legal authority exists for apportionment. A related question, and one that is virtually indistinguishable as a practical matter, is one that the parties and the tax court have not expressly addressed: Whether the legislature intended to impose the transportation services tax under A.R.S. § 42–5062(A) on interstate shipping transactions. We find that analyzing this issue may help us discern the proper resolution of the apportionment question that the parties have presented. Therefore, we elect to consider it.

¶ 41 "[D]oubtful tax statutes should be given a strict construction against the taxing power, giving due regard to the expression of the legislative intent...." *State Tax Comm'n v. Miami Copper Co.*, 74 Ariz. 234, 243, 246 P.2d 871, 877 (1952); *see also Wilderness World*, 182 Ariz. at 198–99, 895 P.2d at 110–11 (explaining that the words of a taxing statute are given their plain and ordinary meanings, and ambiguities in taxing statutes are resolved in favor of the taxpayer).

¶ 42 Arizona Revised Statutes § 42–5062(A) imposes transaction privilege taxes on "the business of transporting for hire persons, freight or property by motor vehicle, railroads or aircraft from one point to another point in this state." As we have observed, A.R.S. § 42–5062 provides no mechanism for apportioning gross receipts from that business between Arizona and non-Arizona mileage and contains no provision that contemplates apportionment of any kind.

¶ 43 On its face, the language of A.R.S. § 42–5062(A) defining the taxable business activity is subject to two interpretations. The phrase "in this state" could be viewed as

---

6. The court noted that the principle of fair apportionment of municipal taxes developed in federal case law under the Commerce Clause, but was adopted and applied to intrastate taxation in *City of Los Angeles v. Shell Oil Co.*, 4 Cal.3d 108, 93 Cal.Rptr. 1, 480 P.2d 953 (1971), as a matter of equal protection and the California constitutional prohibition against extraterritorial application of

state law. By analogy, and pursuant to the due process and equal privileges and immunities provisions of the Arizona Constitution, the *Prescott* court adopted the principle that "[o]ne municipality should not be permitted on the basis of fractional activity to reap an undue windfall at the expense of the taxpayer or another community." 163 Ariz. at 619, 790 P.2d at 274.

modifying the entire provision, including the clause "transporting for hire persons, freight or property." Under that view, the tax would apply only to shipments between points in Arizona over routes entirely within Arizona's boundaries.

¶ 44 Alternatively, the phrase "in this state" could be viewed as modifying only the phrase "from one point to another point." Under that alternative view, the tax would apply to the gross receipts from any shipment between points in Arizona, regardless of where the connecting route might stray.

¶ 45 Considering only the syntax of A.R.S. § 42–5062 and the usage of its language, the latter interpretation would seem the more likely. However, the contrast between A.C.A. § 73–1303(c)(9), which has no modern analogue, and A.C.A. § 73–1303(c)(4) (1939), which is the remote predecessor of A.R.S. § 42–5062(A), strongly suggests that the original legislative intent of subsection(c)(4) was to tax only gross receipts from railroad transportation services between points in Arizona over routes wholly within the state.

¶ 46 The operative language of A.C.A. § 73–1303(c)(4) was virtually identical to that of A.R.S. § 42–5062(A), taxing transportation services between one point and another "in this state." Like current A.R.S. § 42–5062(A), A.C.A. § 73–1303(c)(4) included no provision authorizing or even contemplating apportionment of the tax as applied to interstate transactions.

¶ 47 Section (c)(9) of the same enactment, on the other hand, imposed a complementary tax on railroad transportation "where . . . the service performed is partly within this state, whether the same be performed from any point without this state to a point within this state, or from any point within this state to a point without this state, or from any point without this state through this state to another point without this state." Moreover, in contrast to subsection (c)(4) of A.C.A. § 73–1303, subsection (c)(9) expressly provided that the tax be apportioned according to Arizona and non-Arizona mileage so that only gross receipts from the portion of interstate transportation services that were performed in Arizona would be taxed. The language of A.C.A. § 73–1303(c)(9) thus revealed a legis-

lative understanding that the railroad transportation tax in A.C.A. § 73–1303(c)(4), which continues in force as A.R.S. § 42–5062(A), encompassed no interstate services.

¶ 48 Additionally, during the audit period in this case, ADOR itself apparently shared this interpretation of A.R.S. § 42–5062(A) and its predecessors. Arizona Code Annotated § 73–1303(c)(9) was repealed in 1954. Until 1997, however, some four years after the audit period in this case, Arizona Administrative Code R15–5–1403 nevertheless provided that "[i]ncome from transportation of passengers or property originating outside of the state and carried into the state, originating within the state and carried out of the state, or carried through the state, is not taxable." In our opinion, A.R.S. § 42–5062(A) is inapplicable to transportation services performed over interstate routes. Therefore, Arizona law does not authorize the imposition of transaction privilege taxes on transportation services performed over the Arizona portions of interstate routes, by apportionment or otherwise.

## CONCLUSION

¶ 49 Arizona Revised Statutes § 42–5062(A) cannot constitutionally be applied to tax Southern Pacific's gross receipts from shipping goods from Clifton to other points in Arizona via connections in Lordsburg, New Mexico. Neither Arizona statutory law nor Arizona case law provides authorization for allocating gross receipts from the transportation business between services performed within and without Arizona. Arizona Revised Statutes § 42–5062(A) cannot constitutionally be applied, and as a matter of state law does not apply, to tax any of Southern Pacific's gross receipts from shipping between Clifton and other Arizona destinations via Lordsburg.

¶ 50 Because of our analysis and our conclusions on these points, we need not address whether court-ordered retroactive apportionment of the taxes assessed against Southern Pacific under A.R.S. § 42–5062(A) comported with due process or whether the tax court erred by choosing to apportion the taxes in

question solely based on percentages of track miles outside the boundaries of Arizona.

¶ 51 Southern Pacific requests an award of attorneys' fees and costs under A.R.S. § 12–348(B) (Supp.2001). We grant the request. Southern Pacific may establish the amount of its award by complying with Rule 21(c) of the Arizona Rule of Civil Appellate Procedure.

¶ 52 We reverse and remand with directions to enter judgment for Southern Pacific.

CONCURRING: PHILIP HALL, Presiding Judge and E.G. NOYES, JR., Judge.