146 P.3d 1195 (2006)
KMS FINANCIAL SERVICES, INC., Respondent,
v.
CITY OF SEATTLE, Appellant.
No. 56808-6-I.
Court of Appeals of Washington, Division 1.
September 18, 2006.
Publication Ordered October 16, 2006.
*1197 Kent Charles Meyer, City of Seattle Attorneys Office, Seattle, WA, for Appellant.
Scott M. Edwards, Perkins Coie LLP, Seattle, WA, for Respondent.
*1198 APPELWICK, C.J.
¶ 1 This is a taxation case. The City of Seattle imposed a business and occupation (B & O) tax on the entire gross income of KMS Financial Services, Inc., a brokerage house based in Seattle. KMS argued that the City taxed earnings beyond its constitutional power, and sought a refund of the tax. Both parties filed motions for summary judgment. The trial court granted KMS's motion and denied the City's motion. The City appeals. We reject KMS's argument that the City's tax violates equal protection. We agree with KMS that by seeking to tax income generated by extraterritorial activities, the City's B & O tax as applied to KMS exceeds federal and state constitutional limits. KMS is entitled to apportionment. We conclude that neither party has correctly identified the measure of the tax. We vacate the trial court's order granting KMS's motion and denying the City's motion, and remand for further proceedings consistent with this opinion.

FACTS
¶ 2 KMS, a Washington corporation, is a broker-dealer under the Securities Exchange Act of 1934. KMS is registered with the Securities & Exchange Commission, the National Association of Securities Dealers (NASD), as well as the state securities regulators of all 50 states. KMS's home office is in Seattle, where KMS has approximately 24 employees. KMS did not own or lease any other real property in the period at issue in this case.
¶ 3 KMS has nearly 300 registered representatives who work from approximately 210 business locations in nine western states including Washington. Registered representatives arrange for the purchase and sale of securities under a broker-dealer's account. NASD has extensive rules governing its members and their registered representatives. As a broker-dealer, KMS must supervise its registered representatives, oversee their licensing status, and require them to comply with standards of conduct and procedures set out in a policy manual. KMS reviews and monitors the processing of each transaction arranged by its registered representatives. KMS's Seattle employees fulfill these supervisory tasks by using various remote monitoring methods and by inspecting the registered representatives' offices on a regular basis.
¶ 4 KMS has an independently negotiated contract with each registered representative that sets out the commission amounts. The record includes a sample of such a contract. This contract states that the registered representative is an independent contractor and not an employee. The registered representatives provide their own work spaces, pay their own rent and overhead, and hire their own employees. They retain exclusive control over their work, subject to KMS's policies and federal laws and regulations. They can conduct other business at their offices other than arranging for the sale of securities.
¶ 5 In a typical sale of securities, the client tells the registered representative to purchase or sell a security. The registered representative enters the client's order with KMS's primary clearing firm, Pershing LLC. Pershing executes the trade and records it in the client's account. The client writes a check to KMS or to Pershing (not to the registered representative) to pay for the transaction. The registered representative forwards the check to KMS, and a trade report is generated in KMS's office. After settlement of the trade (usually within three days), KMS receives a commission from Pershing and then pays the registered representative a commission based on its contract with the registered representative. KMS retains between 10 and 15 percent of the commission from Pershing, depending on its contract with the registered representative who generated the order.
¶ 6 The City issued a B & O tax assessment to KMS for additional taxes for January 1, 1999 through March 31, 2003. The City assessed the tax on all the commissions received into KMS's Seattle office no matter where the registered representative who generated the commission was based. The City asserts that because the Seattle office is KMS's sole office, KMS is not entitled to apportionment under the City's tax code. *1199 The City asserts that KMS may not deduct from its gross income the commissions it pays to its registered representatives. KMS does not contest paying taxes on its retained commissions or other miscellaneous income. However, KMS argues that the City's attempt to tax KMS's entire commission unconstitutionally reaches income earned from activities beyond the City's jurisdictional limits. KMS paid the assessed amounts under protest and filed a refund lawsuit against the City. On cross-motions for summary judgment, the trial court granted KMS's motion. The City appeals.

ANALYSIS
I. Standard of Review
¶ 7 This court reviews summary judgment orders de novo, engaging in the same inquiry as the trial court and viewing the facts and inferences in the light most favorable to the non-moving party.[1]Trimble v. Wash. State Univ., 140 Wash.2d 88, 92-93, 993 P.2d 259 (2000). "Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Trimble, 140 Wash.2d at 93, 993 P.2d 259 (citing Clements v. Travelers Indem. Co., 121 Wash.2d 243, 249, 850 P.2d 1298 (1993); CR 56(c)).
II. Seattle's B & O Tax Provisions and Rules
¶ 8 The cities of Washington state have authority to levy B & O taxes. Dravo Corp. v. City of Tacoma, 80 Wash.2d 590, 593, 496 P.2d 504 (1972). Seattle has enacted a B & O tax ordinance that reads in part:
[T]here is hereby levied upon and shall be collected from every person a tax for the act or privilege of engaging in business activities within the City, whether the person's office or place of business be within or without the City.
SMC 5.45.050; see also former SMC 5.44.400.[2] Seattle's B & O tax is calculated by applying a specified tax rate "against gross proceeds of sale, gross income of business, or value of products." SMC 5.45.050; see also former SMC 5.44.400. Stockbroker commission income, like all other commission income, fits under the broad "service and other" classification of SMC 5.45.050(G) to determine the applicable tax rate. See also former SMC 5.44.400(F).
¶ 9 A business's gross income includes commissions. SMC 5.30.035(D). No deductions are allowed from gross income prior to calculating the tax, including labor costs or "any other expense whatsoever paid or accrued." SMC 5.30.035(D). The City's current tax code contains an exemption for real estate agents. Real estate agents are not taxed on their commissions if the agents' brokerage office has already paid tax on the gross commission. SMC 5.45.090(AA). The tax code contains numerous other exemptions for various industries. See generally SMC 5.45.090. For example, insurers who pay a state gross receipts tax are exempt from paying a B & O tax to the city. SMC 5.45.090(N).
¶ 10 The City has delegated authority to the Director of Finance to enact rules to carry out the tax code:[3]
The Director of Finance shall have the power and it shall be his or her duty, from time to time, to adopt, publish and enforce *1200 rules and regulations not inconsistent with this chapter, SMC Chapters 5.30, 5.32, 5.40, 5.45, 5.48, 5.52 or with law for the purpose of carrying out the provisions of such chapters, and it shall be unlawful to violate or fail to comply with, any such rule or regulation.
SMC 5.55.165; former SMC 5.44.130. Consistent with the City's tax code, Seattle's tax rules treat real estate brokers and stockbrokers differently. Real estate brokers, unlike stockbrokers, are permitted to exclude the commissions they pay their associated brokers from the broker's measure of tax. Seattle Tax Rule 5-532; former rules 5-44-128; 5-44-162.
III. Seattle's Disparate Tax Treatment of Stockbrokers and Real Estate Agents Does Not Violate Equal Protection
¶ 11 The federal constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. 14, § 1. The Washington State Constitution provides that "[n]o law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." Const. art. 1, § 12. "Ordinarily inconsistency with our `privileges and immunities' clause implies inconsistency with the federal equal protection clause." City of Seattle v. Rogers Clothing for Men Inc., 114 Wash.2d 213, 233, 787 P.2d 39 (1990). See also Andersen v. King County, 158 Wash.2d 1, 138 P.3d 963, 2006 Wash. LEXIS 598, *18 (holding that the same analysis that applies under the federal equal protection clause applies under the state privileges and immunities clause "unless the challenged law is a grant of positive favoritism to a minority class").
¶ 12 "Legislative bodies have extensive authority to make classifications for purposes of legislation and even broader discretion in making classifications for taxation than it has for regulation." Rogers Clothing, 114 Wash.2d at 234, 787 P.2d 39 (citing Sonitrol N.W., Inc. v. City of Seattle, 84 Wash.2d 588, 590-91, 528 P.2d 474 (1974)). A city council has the same powers of classification as the Legislature. Sonitrol, 84 Wash.2d at 594, 528 P.2d 474. "In Washington, absent involvement of fundamental rights or suspect classifications, equal protection challenges to tax laws are reviewed with a minimum level of scrutiny." Rogers Clothing, 114 Wash.2d at 233, 787 P.2d 39. The plaintiff has a heavy burden of overcoming the presumption of constitutionality. Forbes v. City of Seattle, 113 Wash.2d 929, 941 n. 12, 785 P.2d 431 (1990).
¶ 13 There is a three-part test to determine whether a legislative classification is constitutional:
To comply with Const. art. 1, § 12, a legislative classification must meet three requirements: (1) the legislation must apply alike to all persons within a designated class; (2) there must be reasonable grounds for distinguishing between those who fall within the class and those who do not; and (3) the disparity in treatment must be germane to the object of the laws in which it appears.
Rogers Clothing, 114 Wash.2d at 234-35, 787 P.2d 39. "[A] classification based solely on a difference in the method of operation of a particular kind of business is permissible." Sonitrol, 84 Wash.2d at 588, 591, 528 P.2d 474 (upholding disparate tax classifications for taxpayers who sell burglar alarms systems and those who provide other types of burglar prevention services); see also, e.g., Rogers Clothing, 114 Wash.2d at 235-36, 787 P.2d 39 (upholding disparate tax treatment of large department stores and small individual retailers); Forbes, 113 Wash.2d at 931, 943-44, 785 P.2d 431 (upholding exemption for nonprofit theaters against equal protection challenge because those attending for-profit theaters are in different class from those attending nonprofit theaters and broad legislative discretion justified disparate treatment); Oil Heat Inst. v. City of Mukilteo, 81 Wash.2d 7, 498 P.2d 864 (1972) (upholding different tax rates on gas and fuel oil); Hemphill v. Tax Commission of Wash., 65 Wash.2d 889, 400 P.2d 297 (1965) (upholding sales tax exemption for bowling alleys but not skating rinks from tax on "amusement and recreation businesses" against equal protection challenge).
*1201 ¶ 14 KMS argues that because the City's tax code includes all commission income under the same classification, the City must treat stockbrokers and real estate agents the same. Cf. Lone Star, 71 Wash.2d at 571, 429 P.2d 909 (holding that companies in the same class "must, for constitutional reasons, be treated alike"). At its core, KMS's argument is that any business that comes under the broad catch-all of SMC 5.45.050(G) or former SMC 5.44.400(F) is in the same "classification," and must be treated identically. KMS contends that a policy decision by the Director of Finance to treat these two businesses differently does not alter their legislative classification under the tax code.
¶ 15 KMS argues that Davenport, Inc. v. Department of Revenue, 6 Wash.App. 581, 584-85, 494 P.2d 1376 (1972), controls. In Davenport, the court held that real estate brokers are a group of individuals acting as a unit and thus cannot be taxed twice on a single commission. The Davenport court relied on language in the state's taxation statute defining a "person" or "company" as "any group of individuals acting as a unit." Davenport, 6 Wash.App. at 583, 494 P.2d 1376 (citing RCW 82.04.030). The Davenport court concluded that real estate brokerage office is best described as a group of individuals acting as a unit, and that the tax can therefore be levied only once against each commission. Davenport, 6 Wash.App. at 585, 494 P.2d 1376.
¶ 16 The City argues that KMS is not splitting commissions with its registered representatives, but is instead receiving commissions from clearinghouses, and then using proceeds from those commissions to pay its registered representatives independently negotiated contractual commissions. Thus, the City argues, KMS is more like the insurance brokers in Impecoven v. Department of Revenue, 120 Wash.2d 357, 365, 841 P.2d 752 (1992), than the real estate agents in Davenport.
¶ 17 Licensed insurance agents can "sell insurance either under a direct appointment contract with an insurance company or as an affiliate with an insurance agent holding an appointment contract." Impecoven, 120 Wash.2d at 359, 841 P.2d 752. The Impecoven plaintiffs were independent contractors affiliated with another agent (J.D. Blasingame Agency, Inc.) who in turn held several direct appointment contracts with insurance companies. Impecoven, 120 Wash.2d at 359, 841 P.2d 752. The plaintiffs determined which insurance product was best suited to their clients' needs and decided whether to sell the insurance coverage, and Blasingame entered into contracts with insurance companies and dealt with the Insurance Commissioner's office on licensing, maintained the office, signed insurance contracts, and collected all commissions. Impecoven, 120 Wash.2d at 359, 841 P.2d 752.
¶ 18 The clients paid premiums directly to the insurance company, and the insurance company paid Blasingame a commission for each sale. Blasingame then paid the agent responsible for the sale a percent of that commission. Impecoven, 120 Wash.2d at 360, 841 P.2d 752. "The commission rate was independently negotiated between the plaintiffs and Blasingame. Plaintiffs ha[d] no right to receive their commissions directly from any insurance company." Impecoven, 120 Wash.2d at 360, 841 P.2d 752. The plaintiffs argued that they and Blasingame were one "person" for the purposes of B & O taxation because they constituted a "group of individuals acting as a unit" in obtaining one commission. Relying on Davenport, the plaintiffs argued that there was no difference between the licensing structure and operation of the two businesses.
¶ 19 The Impecoven court explained and distinguished the Davenport decision. The Davenport decision arose after the Washington State Department of Revenue (the Department) changed its regulations relating to real estate brokers. Originally, the Department allowed designated real estate brokers to deduct the amount of commissions paid to associate brokers prior to calculating their gross income. The Department amended its regulation to disallow that deduction. The Davenport court held that this new regulation was at odds with the definition of "person" in the statute. Davenport, 6 Wash.App. at 585, 494 P.2d 1376. Subsequent to the Department's adoption of the new rule but *1202 prior to the decision in Davenport, the Legislature resolved the choice of policies under the definition of a taxpayer by enacting a statute that expressly eliminated the tax on the associate broker when the brokerage office paid tax on the full commission. Impecoven, 120 Wash.2d at 361, 841 P.2d 752. The statute is similar to the City's ordinance in this case providing this exemption to real estate brokers.
¶ 20 The Impecoven court, interpreting the statute, noted that the legislative intent to provide a deduction for real estate brokers did not apply for insurance agents.[4]Impecoven, 120 Wash.2d at 362, 841 P.2d 752. In the absence of that specific legislative intent, the Impecoven court narrowly construed the exemption statute as required "to best advance the legislative purpose behind the general liability provision." Impecoven, 120 Wash.2d at 363, 841 P.2d 752. The court held that "the legislative purpose behind the B & O tax scheme is to tax virtually all business activity in the state" and that the "statute has been construed as providing for the taxing of separate but related activities." Impecoven, 120 Wash.2d at 363, 841 P.2d 752. The Impecoven court stressed that the insurance agents and Blasingame engaged in different although related activities, and reject the contention that the Department was taxing the "mere cutting of a check" by Blasingame to the agents. Impecoven, 120 Wash.2d at 364, 841 P.2d 752. Instead, the court held that the issuance of the check resulted from the structure chosen by the plaintiffs to gain various advantages, and that although "the gross receipts of each may ultimately result from the same source, . . . each activity is separate and each may be taxed." Impecoven, 120 Wash.2d at 364, 841 P.2d 752. The court upheld the separate taxation of the commission to Blasingame and the subsequent commission to the agents. Impecoven, 120 Wash.2d at 364, 841 P.2d 752.
¶ 21 Although the Impecoven decision addressed insurance agents and not stockbrokers, its reasoning is applicable here. KMS's business structure parallels that of the insurance agents in Impecoven more closely than that of the real estate brokers in Davenport. The Seattle City Council has enacted an exemption for real estate agents and brokers that it did not enact for stockbrokers or securities dealers. Prior to the enactment of this exemption, the City's tax rules allowed real estate agents but not stockbrokers to deduct their commissions in the same way as the state rule in Davenport. Compare former Seattle Tax Rules 5-44-128 and 5-44-162 with former Wash. Revenue Rule 128 (cited in Davenport, 6 Wash.App. at 583, 494 P.2d 1376). And, the City's definition of "person" has substantially similar language as the State's definition on which the Davenport court relied. Compare SMC 5.30.040(F) with RCW 82.04.030. Thus, similarly to the state tax rule at issue in Davenport, the City's former tax rule 5-44-128 allowing an exemption for real estate brokers gave effect to the City's legislative intent and was valid. See Davenport, 6 Wash.App. at 584-85, 494 P.2d 1376 (rejecting Department's argument that tax rule allowing deduction was contrary to legislative intent in absence of statute authorizing deduction). The City's subsequent amendment expressly adding the exemption to its tax code does not change the validity of the rule.
¶ 22 Under Davenport and Impecoven, we hold that real estate brokers and stockbrokers are not similarly situated under the City's tax code. The disparate treatment included in the current code exemption provision falls within the broad discretion of the City Council. And, the exemptions allowed in the former tax rules gave effect to the City's legislative intent in the definitions of the tax code, paralleling the state tax code. Therefore, the City's disparate treatment of real estate agents and stockbrokers is within the City's discretion and does not violate equal protection.
IV. The City's B & O Tax Assessment Exceeds Federal and State Limits on Extraterritorial Taxation
¶ 23 The City argues that KMS is subject to the City's B & O tax. The City asserts *1203 that the measure of the tax is KMS's entire gross income wherever earned, with no deduction for or exclusion of commissions KMS pays its registered representatives. The City contends that this measure of tax meets constitutional requirements. KMS argues that the City is attempting to tax income derived from activities conducted outside of the City's borders contrary to federal and state constitutional law. KMS asserts that the City's remaining arguments are therefore non-issues that this court need not address.
¶ 24 Federal and state constitutional law limit a jurisdiction's power to tax activities occurring outside its boundaries. Because KMS's registered representatives operated in Seattle, in other Washington state locations, and in locations outside Washington state, the City's tax must meet both state and federal constitutional requirements.
A. The City's B & O Tax Assessment Exceeds the City's Power to Tax Interstate Commerce Under Federal Law
¶ 25 The U.S. Supreme Court has set out a four-part test to determine whether a tax violates the federal Commerce Clause, including that clause's negative command known as the dormant commerce clause. Ok. Tax. Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 179, 183, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995) (citing Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977)). First, the tax must apply to an activity with "substantial nexus" to the taxing state. Second, it must be "fairly apportioned." Third, it must not discriminate against interstate commerce. And fourth, it must be fairly related to services or benefits provided by the state. Complete Auto, 430 U.S. at 279, 97 S.Ct. 1076.
¶ 26 Fair apportionment is at issue here. A gross receipts tax is "simply a variety of tax on income, which [is] required to be apportioned to reflect the location of the various interstate activities by which it was earned." Jefferson Lines, 514 U.S. at 190, 115 S.Ct. 1331. The "central purpose behind the apportionment requirement is to ensure that each State taxes only its fair share of an interstate transaction." Goldberg v. Sweet, 488 U.S. 252, 260-61, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989).
¶ 27 The Constitution does not require a single apportionment formula. Rather, "a tax is fairly apportioned [if] it is internally and externally consistent." Goldberg, 488 U.S. at 261, 109 S.Ct. 582. Internal consistency requires a tax to be "structured so that if every State were to impose an identical tax, no multiple taxation would result." Goldberg, 488 U.S. at 261, 109 S.Ct. 582. "The external consistency test asks whether the State has taxed only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed." Goldberg, 488 U.S. at 262, 109 S.Ct. 582.
¶ 28 To determine external consistency, the court looks to the "economic justification for the State's claim upon the value taxed." Jefferson Lines, 514 U.S. at 185, 115 S.Ct. 1331. There must be "a rational relationship between the income attributed to the state and the intrastate values" of the business being taxed. Hunt-Wesson, Inc. v. Franchise Tax Bd. of Cal., 528 U.S. 458, 464, 120 S.Ct. 1022, 145 L.Ed.2d 974 (2000) (citations omitted). The measure of the tax "must actually reflect a reasonable sense of how income is generated." Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 169, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983). A local government "may not tax value earned outside its borders." Allied-Signal, Inc. v. Dir., Div. of Taxation, 504 U.S. 768, 777, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992). A tax that is "out of all appropriate proportion to the business transacted by the [taxpayer] in that State" violates the commerce clause. Hans Rees' Sons, Inc. v. N. Carolina ex rel. Maxwell, 283 U.S. 123, 135, 51 S.Ct. 385, 75 L.Ed. 879 (1931).
¶ 29 We need not address the internal consistency of the City's tax. Although the City argues that its tax is internally consistent, KMS correctly asserts that KMS "did not argue below that the City's tax code is internally inconsistent." KMS is not challenging the internal consistency of the City's ordinance, but only the external consistency *1204 of the assessment imposed on KMS. See State v. Hall, 95 Wash.2d 536, 539, 627 P.2d 101 (1981) ("A court should avoid reaching constitutional issues if the issue can be resolved in some other way.").
¶ 30 We therefore address whether the City's tax is externally consistent as applied to KMS. The City's B & O tax is imposed on all business activities within Seattle City limits. The City notes that its tax code permits businesses with offices within and without city limits to apportion their gross income among their offices. SMC 5.45.080C; former SMC 5.44.428. However, the City contends that absent an office outside the City, no apportionment is permissible under the tax code. The City asserts that the business locations of KMS's registered representatives are not "offices" within the meaning of SMC 5.30.040D. Thus, the City contends that KMS's sole "office" is its Seattle office, that KMS is not entitled to apportion its income, and that its entire gross income must be designated to its Seattle office.
¶ 31 A similar circumstance was presented in Northwood Construction Co. v. Township of Upper Moreland, 579 Pa. 463, 856 A.2d 789, (2004), cert. denied 544 U.S. 962, 125 S.Ct. 1736, 161 L.Ed.2d 604 (2005). In that case, a township imposed a gross receipts tax on a construction business headquartered in the township because it had no "bona fide" offices outside the township.[5] As here, there was "apparently no dispute" that the business "engaged in interstate commerce and that a significant portion of [its] receipts in the relevant tax years were generated" at out-of-state construction sites. Northwood, 856 A.2d at 804.
¶ 32 The Pennsylvania Supreme Court rejected the lower court's holding that the tax was externally consistent and was justified on the ground that the company maintained "an office within the Township where, from that office, a company is able to manage, direct and control all its interstate business." Northwood, 856 A.2d at 794-95. Instead, the court held that taxing 100 percent of the company's receipts from interstate commerce without attempting to allocate those receipts for in-state versus out-of-state activity was "out of all appropriate proportion to" and had no "rational relationship" with the company's business in the township. Northwood, 856 A.2d at 803-04. The court stressed the purpose of the apportionment requirement:
Moreover, on constitutional grounds, we simply cannot accept the . . . conclusion that Northwood's maintenance of its primary business office in the Township permits the Township to tax 100 [percent] of Northwood's receipts generated in connection with interstate activity. The Commonwealth Court characterized the tax as one on the privilege of maintaining an office in the Township, and thus, concluded that it taxes in-state activity only. However, when considering the constitutionality of a gross receipts tax, it is the activities that generate those gross receipts that are determinative in an apportionment analysis as it is only the receipts generated from the in-state component of the underlying activity that the Township may properly tax under constitutional apportionment principles.
The Township essentially takes the position that it is under no obligation to allocate Northwood's receipts among the other states in which Northwood conducts business, because the [township's tax code] ensures that there is no risk of multiple taxation. In forwarding this argument, the Township essentially ignores Supreme Court precedent that the "central purpose behind the apportionment requirement is to ensure that each state taxes only its fair share of an interstate transaction," Goldberg, 488 U.S. at 260, 109 S.Ct. 582 and instead cites the opinion of the Commonwealth Court below for the proposition that "[t]he primary test of apportionment is avoidance of multiple taxation." However, we cannot be similarly dismissive of the controlling Supreme Court jurisprudence. While the Supreme Court has characterized the principle of fair apportionment as "the lineal descendent of Western Live Stock's prohibition of multiple taxation," Oklahoma Tax Comm'n, 514 U.S. at 184, *1205 115 S.Ct. 1331 (referring to Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823 (1938)), the external consistency requirement ultimately mandates that a tax not "reach[] beyond that portion of value that is fairly attributable to economic activity within the taxing State," irrespective of whether there is a genuine risk of multiple taxation. Id. at 185, 115 S.Ct. 1331 see Southern Pac. Transp. Co. v. Arizona, Dep't of Revenue, 202 Ariz. 326, 44 P.3d 1006, 1012 (Ariz.Ct.App.2002) (rejecting "proposition that a state's tax on interstate commerce must be deemed externally consistent unless the aggrieved taxpayer establishes that a multiple tax burden actually exists"); [Walter] Hellerstein, [Is "Internal Consistency" Foolish: Reflections on an Emerging Commerce Clause Restraint on State Taxation, 87 Mich. L.Rev. 138,] 186 [(1988) ] ("Wholly apart from its role in preventing multiple taxation, the fair apportionment criterion serves to limit the territorial reach of state power by requiring that the state's tax base corresponds to the taxpayer's in-state presence."). As such, even assuming arguendo that the Township is correct that [there is no] risk of multiple taxation, we disagree that the Township's apportionment obligations are therefore satisfied. Rather, we conclude that the appropriate inquiry remains whether the Township has taxed only that "portion of the revenues from the interstate activity which reasonably reflects the instate component of the activity being taxed." Goldberg, 488 U.S. at 262, 109 S.Ct. 582. Here, as explained above, the Township is plainly taxing more than that "portion of the revenues from [Northwood's] interstate activities which reflect the instate component of the activity being taxed," id., as it is taxing all of the revenues from Northwood's interstate activities. Accordingly, we hold that the tax does not satisfy the external consistency prong of Complete Auto and is therefore unconstitutional.
Northwood, 856 A.2d at 804-06 (footnotes and some citations omitted).
¶ 33 The City argues that the Northwood court ruled that the tax was unconstitutional because the company in that case had other offices, and also that the Northwood court misapplied the external consistency test by ignoring the ameliorative effect of credits for other taxes. To the contrary, the Northwood court emphasized that the mere presence or absence of other offices was not a key consideration, but that the focus must be on the activities that generated the gross receipts. And, as the Northwood court explained, removing the risk of multiple taxation does not by itself satisfy the external consistency requirement. Internal inconsistency is concerned with multiple taxation, whereas external inconsistency is addressed to whether the taxing authority is seeking to tax its fair share of interstate income. See Jefferson Lines, 514 U.S. at 190, 115 S.Ct. 1331 Goldberg, 488 U.S. at 261-62, 109 S.Ct. 582. A "credit" to remedy multiple taxation does not meet the requirement that a tax on income "be apportioned to reflect the location of the various interstate activities by which it [is] earned." Jefferson Lines, 514 U.S. at 190, 115 S.Ct. 1331. Such a result would collapse the external and internal consistency requirements into a single requirement.
¶ 34 We agree with the reasoning of the Northwood court. The City has not provided any basis on which the restriction of taxation on extraterritorial income-generating activities should be limited to cases where the taxpayer maintains extraterritorial offices. Although KMS may not maintain "offices" outside Seattle, it is undisputed that some of its registered representatives generate sales outside Washington state.[6] The City does not assert that all securities transactions which generate commissions occur inside the City of Seattle. As in Northwood, the City here is plainly taxing more than that "portion of the revenues from [KMS's] interstate activit[ies] which . . . reflect[ ] the in-state component of the activity being taxed." See *1206 Goldberg, 488 U.S. at 262, 109 S.Ct. 582. We hold that attributing the entire proceeds of KMS's registered representatives to KMS's Seattle office because that is KMS's sole office violates the external consistency requirement of federal commerce clause jurisprudence.
¶ 35 This result is in line with the Department's interpretation of the state's B & O tax. Washington's B & O tax, like the City's, imposes a gross income tax on "the act or privilege of engaging in business activities." RCW 82.04.220. The Department has interpreted the state's B & O provision to hold that "[a]pportionment may not be denied solely because the taxpayer does not maintain a place of business outside this state." Det. No. 87-186, 3 Wash. Tax Dec. 195 (1987). In a case involving a broker dealer and registered representatives with facts remarkably similar to those of this case, the Department applied the Complete Auto test and held that its fair apportionment prong required the State to apportion gross income because the taxpayer engaged in more than incidental business outside Washington state. Det. No. 98-196, 19 Wash. Tax Dec. 19 (2000). We reach the same result here.
B. The City's Assessment Violates State Law Limits on Local Government Taxing Authorities
¶ 36 "Our Supreme Court, in molding limits upon the exercise of a municipal corporation's power to impose a business and occupation tax on local business activities, has analogized from decisions of the United States Supreme Court in cases involving state taxation of interstate commerce." Tacoma v. Fiberchem, Inc., 44 Wash.App. 538, 543, 722 P.2d 1357 (1986). Under state law, the tax must satisfy a three-part test. Fiberchem, 44 Wash.App. at 543, 722 P.2d 1357. First, the relevant taxable event must be identified. Dravo Corp., 80 Wash.2d at 595, 496 P.2d 504. Second, the taxable event must occur within the municipality's territorial limits. Dravo Corp., 80 Wash.2d at 594, 496 P.2d 504. "[A] taxing authority has no power to levy a tax upon activities which occur outside its territorial limits." Dravo Corp., 80 Wash.2d at 594, 496 P.2d 504. Third, there must be a minimum connection between the municipality and the transaction it seeks to tax. Dravo Corp., 80 Wash.2d at 598-99, 496 P.2d 504 (citing federal cases that set forth this requirement as to interstate taxation).
¶ 37 These limits apply even when the incident of taxation is the privilege of doing business within a city:
The phrase, "the privilege of doing business," . . . is all-inclusive; but taxation of that privilege must be confined to a standard within the territorial limits of [the city], for the city has no power either to authorize, license, or tax activities beyond its territorial limits.
Dravo Corp., 80 Wash.2d at 594, 496 P.2d 504 (quoting Lone Star Cement Corp. v. Seattle, 71 Wash.2d 564, 572, 429 P.2d 909 (1967)) (internal quotations omitted). "The fact that the value which the gross receipts measure is, in large part, the result of activity outside the territorial limits of the taxing jurisdiction does not mean the gross receipts are not fairly related to the activity within the jurisdiction." Dravo Corp., 80 Wash.2d at 599, 496 P.2d 504. But, to show the requisite minimum connection, there must be a reasonable relationship between the taxing entity and the taxable event to justify taxation, and the measure of the tax must be fairly and closely related to the taxed activities of the taxpayer within the boundaries of the municipality. Fiberchem, 44 Wash.App. at 543, 722 P.2d 1357 (citing Dravo Corp., 80 Wash.2d at 597-599, 496 P.2d 504).
¶ 38 In Lone Star, Seattle sought to impose a tax on the "privilege of engaging in business activities" on manufacturers or sellers at wholesale or retail. The measure of the tax was the value of the products manufactured, or the gross proceeds of sales. The tax code provided for apportionment where the activity taxed occurred partially within and partially without the city. Dravo Corp., 80 Wash.2d at 594, 496 P.2d 504 (citing Lone Star). Lone Star had two cement manufacturing plants, one in Seattle and one in Concrete, Washington. Over 88 percent of the cement products manufactured and sold at the Concrete plant were delivered to destinations outside Seattle. The Seattle office took *1207 no part in that business other than to receive information about it daily. Seattle attempted to tax the entire gross proceeds of sales from the Concrete plant. The court held that Seattle could not constitutionally tax sales made from the city of Concrete that did not enter Seattle. The court held that where the taxable events were sales made outside the city, the city could not impose a B & O tax. Dravo Corp., 80 Wash.2d at 594-95, 496 P.2d 504 (citing Lone Star).
¶ 39 In Dravo Corp., the taxpayer construction company entered into a contract with the City of Tacoma to build a dam. Tacoma's B & O tax ordinance provided that there would be "a tax on the act or privilege of engaging in business activities and transactions with the city" and that the tax "shall be levied on the privilege of accepting and executing the contract." Dravo Corp., 80 Wash.2d at 594, 496 P.2d 504 (emphasis omitted). The court noted that the taxable event was "accepting and executing the contract," and that this unambiguous language referred to entering into the contract, and not performing the contract. Dravo Corp., 80 Wash.2d at 595-96, 496 P.2d 504. That taxable incident formed a sufficient contact, or nexus, with the taxing entity. Dravo Corp., 80 Wash.2d at 599-600, 496 P.2d 504. The court held that because the contract was made in the City, the measure of the tax in that case  the full contract price  reasonably related to the activity taxed  entering into the contract. Dravo Corp., 80 Wash.2d at 599-600, 496 P.2d 504.
¶ 40 In this case, the taxable event is "engaging in business activities within the City." SMC 5.45.050; see also former SMC 5.44.400. The income the City is attempting to reach as part of its tax base includes commission income generated from the purchase or sale of securities outside of Seattle and outside of Washington state. Taxing of the interstate transactions is limited by federal constitutional law as explained above. And under Fiberchem, Lone Star, and Dravo Corp., the City cannot tax income generated by securities transactions within Washington state but outside Seattle city limits when the incident of taxation is the privilege of doing business in the City. Whether or not KMS maintains an "office" as defined by the City's tax ordinance is not a determining factor in the state law test of the limits of a municipality's taxing power. The City must fairly apportion KMS's gross receipts based on where the income-generating activity occurred. The assessment did not fairly apportion KMS's gross receipts.
V. Additional Issues Affecting Calculation of KMS's Taxable Gross Income
¶ 41 The City addressed several other issues in its opening brief. Because KMS relied on its extraterritorial and equal protection arguments in its response brief on appeal, it chose not to address these additional issues to this court. Nevertheless, we reach these issues as they will affect the resolution of this case on remand.
A. Independent Contractor or Employee Status of Registered Representatives Has No Tax Consequence
¶ 42 The City argues that the registered representatives are independent contractors, and not employees. But as the City notes, whether the registered representatives are independent contractors or employees does not affect KMS's tax liability. Under the City's tax code, no deductions are allowed from gross income prior to calculating the tax, including labor costs or "any other expense whatsoever paid or accrued." SMC 5.30.035(D). There is no differentiation based on whether compensation is for employees or for independent contractors. Therefore, we need not determine whether the registered representatives are employees or independent contractors; no exclusion is allowed.
B. Fair Apportionment Does Not Necessarily Permit KMS to Deduct Commissions Paid to Extraterritorial Registered Representatives from Its Gross Income
¶ 43 KMS is not necessarily entitled to deduct commissions paid for extraterritorial transactions to effect a fair apportionment. Facing a similar factual scenario, the Department stated:

*1208 the taxpayer is entitled to apportion its gross income because it is engaged in more than incidental business activities both within and without Washington. However, we do not believe this necessarily means the taxpayer is entitled to simply deduct the commission payments from its gross income. Rather, RCW 82.04.460 provides for separate accounting, if it can be accurately done, or, in the alternative, the cost accounting method where the taxpayer must identify its in-state costs and compare those to all costs for the purpose of cost apportionment.
Det. 98-196. Similarly, the SMC contains some provisions on apportionment. SMC 5.45.080 (entitled "Persons conducting business both within and without the City"); former SMC 5.44.428. This code section specifically provides that allocation "shall be made in accordance with and in full compliance with the provisions of the interstate commerce clause of the United States Constitution where applicable." SMC 5.45.080(C); see also former SMC 5.44.428. Former Seattle Tax Rule 5-44-162, which governs stockbrokers and security houses, sets out specific apportionment methods.
VI. Trial Court Action on Remand
¶ 44 The trial court granted KMS's motion for summary judgment and overturned the entire assessment. It did not apportion the tax. This was error. Neither KMS nor the City was correct as to the proper amount of tax. Contrary to the City's position, the proper measure of tax is not KMS's entire gross income from all its registered representatives, wherever located. The City taxed KMS using the correct tax theory as a "service and other" business. However, KMS is entitled to fair apportionment of its income to account for extraterritorial income-generating activity prior to application of the tax rate.
¶ 45 But KMS is also not correct as to the proper measure of tax. KMS may not deduct from its gross income that portion of its commissions that it pays to its registered representatives that operate within Seattle City limits. See SMC 5.30.035(D). KMS also is not necessarily entitled to simply deduct non-retained commissions paid to its other registered representatives to effect an apportionment. Rather, it must comply with the apportionment methods envisioned by the City's tax code.
¶ 46 Under the current SMC § 5.55.140(B) review provision, the City's tax assessment is presumed correct and KMS bears the burden of proving to the trial court that the assessment is incorrect and establishing the correct amount of tax. KMS has overcome the presumption of correctness, but must now prove the amount of tax due.
¶ 47 We vacate the trial court's order granting KMS's summary judgment motion and denying the City's summary judgment motion. We remand for further proceedings consistent with this opinion.
WE CONCUR: DWYER and BAKER, JJ.
NOTES
[1] KMS asserts that the City failed to argue the constitutional limits on extraterritorial taxation in its opening brief, and therefore this court should affirm the trial court's order without considering the arguments that the City did submit. The City's failure to specifically assign error to one basis on which the trial court may have granted summary judgment does not render the summary judgment unavailable for review or otherwise affect our review of the case.
[2] Effective January 1, 2002, the City reorganized and amended its tax code by enacting chapter 5.45 SMC and repealing chapter 5.44 SMC. The audit period started before and ended after the amendment. Although the effect of the relevant provisions did not change, this opinion addresses both versions.
[3] KMS moved to strike several pages of the City's reply brief that addressed this delegation of authority, as raising a new issue. The City has not raised a new issue. KMS's response brief argued that the City had not created a separate classification for stockbrokers. The City has raised a legal basis to support its argument that the City's disparate treatment of real estate brokers and stockbrokers does not violate equal protection. We consider the City's reply brief in its entirety.
[4] The Impecoven court further noted that the Davenport "conclusion was made in the context of legislative acquiescence to the original DOR regulation which allowed the deduction and the enactment of RCW 82.04.255 following DOR's elimination of the deduction." Impecoven, 120 Wash.2d at 362, 841 P.2d 752.
[5] In Northwood, as here, the parties disputed whether the extraterritorial business locations were "offices." See Northwood, 856 A.2d at 793 n. 1.
[6] KMS had registered representatives in nine western states. It is unclear from the record how much of KMS's business is in-state versus out-of-state; the record reports the income based on in-city and out-of-city revenue. Nevertheless, it is undisputed that some of KMS's gross income subject to the City's assessment was derived from out-of-state income-generating activity.